UNITED STATES of America

v.

**ROHM AND HAAS COMPANY; Rohm and Haas Delaware Valley, Inc.; Chemical Properties, Inc.; Bristol Township Authority, Appellants.**

No. 92–1517.

United States Court of Appeals,
Third Circuit.

Argued Jan. 21, 1993.

Decided Aug. 12, 1993.

Sur Petition for Rehearing Oct. 22, 1993.

Vicki A. O'Meara, Acting Asst. Atty. Gen., John Stahr, Anna Thode, Dept. of Justice, Environment & Natural Resources Div., Michael M. Baylson, U.S. Atty., James G. Sheehan, Chief, Civ. Div., Debra L.W. Cohn (Argued), Asst. U.S. Atty., Philadelphia, PA, of counsel: Sheila Igoe, U.S. E.P.A. Office of Gen. Counsel, Judith Hykel, U.S. E.P.A., Office of Regional Counsel, for appellee.

John G. Harkins, Jr. (Argued), Harkins Cunningham, David Richman, Pepper, Hamilton & Scheetz, Philadelphia, PA, Gerald P. Norton, Harkins Cunningham, Washington, DC, John T. Subak, Ellen S. Friedell, Rohm and Haas Co., Philadelphia, PA, for appellants Rohm and Haas Co., Rohm and Haas Delaware Valley, Inc., Bristol Tp. Authority.

Philip L. Hinerman (Argued), A. John May, III, Michael Bramnick, Pepper, Hamilton and Scheetz, Philadelphia, PA, for appellant Chemical Properties, Inc.

Kenneth A. Rubin, Michael W. Steinberg, Hunter L. Prillaman, Morgan, Lewis & Bockius, and David F. Zoll, Dell E. Perelman, Jacqueline A. Sincore, Chemical Mfrs. Ass'n, Washington, DC, for Chemical Mfrs. Ass'n.

G. William Frick, William H. Crabtree, John Wagner, American Petroleum Institute, Washington, DC, for American Petroleum Institute.

Karl S. Bourdeau, Aaron H. Goldberg, Beveridge & Diamond P.C., Washington, DC, for American Iron and Steel Institute.

Tony K. Allen, Douglas H. Green, Piper & Marbury, Washington, DC, for Edison Elec. Institute, the American Public Power Ass'n, and the National Rural Elec. Co op. Ass'n.

Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, DC, for Chamber of Commerce of the U.S.

William H. Crabtree, Thomas R. Merlino, Motor Vehicle Mfrs. Ass'n of the U.S., Inc., Detroit, MI, for Motor Vehicle Mfrs. Ass'n.

Cynthia H. Evans, American Paper Institute, Washington, DC, for American Paper Institute, for amici curiae in support of appellant.

Before: STAPLETON and COWEN, Circuit Judges, and BARRY, District Judge[*].

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

This case presents an important issue of first impression regarding the extent of a responsible party's liability under § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607 (1988). We are asked to decide whether costs incurred by the government in overseeing a hazardous waste cleanup performed and paid for by a private party pursuant to the Resource Conservation and Recovery Act ("RCRA") are recoverable under CERCLA's liability provision which provides for recovery of all costs of removal and remedial action incurred by the United States. In so doing, we also must

---

[*] Honorable Maryanne Trump Barry, United States District Judge for the District of New Jersey, sitting by designation.

reach the more fundamental question of whether CERCLA's provision allowing recovery of federal removal and remedial costs contemplates the recovery of costs incurred overseeing a private party's removal and remedial action. Defendant Chemical Properties also raises separate issues relating to whether an owner of part of a CERCLA facility should be jointly and severally liable for response costs incurred at the entire facility. This appeal involves no challenge to the district court's findings of fact.

### I. Factual Background

This case arises from the cleanup of hazardous wastes from a 120–acre landfill in Bristol Township, Pennsylvania, next to the Delaware River. Rohm and Haas ("R & H") owned the entire site from 1917 to 1963. In 1963, it sold 14.5 acres to the Bristol Township Authority ("BTA") and in 1968 and 1971 it sold a total of 10.94 acres to Chemical Leasing Corporation, now known as Chemical Properties, Inc. ("CP"). In 1978, R & H transferred the remainder of the site to its wholly owned subsidiary, Rohm and Haas, Delaware Valley, Inc. ("R & H–DVI").

From 1917 to 1975, R & H used the site for disposal of general refuse, process wastes, and offgrade products from R & H's plastics and chemical manufacturing plants. In 1981, R & H–DVI notified EPA that 309,000 tons of waste were disposed of at the site including at least 4,600 tons of hazardous substances as defined by 42 U.S.C. § 9601(14). From 1970 to 1984, a tank-truck hauling facility operated at CP's portion of the site; trucks were dispatched, maintained, and occasionally cleaned at this facility. Beginning in 1979, EPA began monitoring the site and the defendants' activities at the site. Investigations by both EPA and the defendants found hazardous substances present at the site in the air, soil, and groundwater. These hazardous substances were present at portions of the site owned by R & H–DVI, BTA, and CP.

On April 10, 1985, EPA proposed to add the site to the National Priorities List and on August 28, 1986, EPA sent R & H–DVI a draft consent order under § 106 of CERCLA, 42 U.S.C. § 9606, requiring certain work to be done at the site and providing for reimbursement of all of the government's response and oversight costs. R & H–DVI did not sign, but rather sent a letter to EPA on October 10, 1986, stating that, in R & H–DVI's opinion, the site was inappropriate for handling under CERCLA, under published policy, but rather should be managed under RCRA.[1] Because R & H–DVI was willing to take corrective action and clean up the site at its own expense, EPA agreed. On February 4, 1987, EPA informed R & H–DVI that it had decided to manage the site under RCRA. New personnel from EPA's RCRA office were assigned and the site was subsequently removed from the proposed National Priorities List.

On February 6, 1989, R & H–DVI and EPA entered into an Administrative Consent Order under § 3008(h) of RCRA, 42 U.S.C. § 6928(h). This order provided for R & H–DVI to perform various cleanup related activities on all portions of the site, including those owned by BTA and CP. It did not provide for reimbursement of the government's costs in implementing the order. Pursuant to this order, R & H–DVI has performed required work at the site and continues to do so.[2] This work has been, and continues to be, overseen by EPA.

In November, 1990, the United States brought this action pursuant to CERCLA § 107, 42 U.S.C. § 9607, attempting to recover from the defendants all costs incurred by the government in connection with the site since 1979, and seeking declaratory judgment

---

**1.** In order to conserve Superfund funds and promote private cleanups, EPA promulgated a policy whereby facilities which potentially could be subject to both CERCLA and RCRA will be managed under RCRA and not listed on the National Priorities list, except where the owner or operator is unable or unwilling to take corrective action. *See* EPA, RCRA/NPL Listing Policy, 51 Fed.Reg. 21054, 21057–59 (1986).

**2.** From October 31, 1986 through July 1987 (prior to the order), R & H–DVI removed approximately 11,700 cubic yards of waste and soil from the BTA portion of the site. EPA monitored this work.

declaring recoverable all future costs incurred at the site.[3] Most of these costs were incurred by the government after it had notified R & H–DVI, in February 1987, that it would be managing the site under RCRA rather than CERCLA.[4] The district court found in favor of the government against all four defendants, holding that all the elements of CERCLA liability were met and that none of the five defenses offered were applicable. It therefore issued an order holding defendants liable for $401,348.78 and for "all costs properly incurred under CERCLA thereafter." *United States v. Rohm & Haas*, 790 F.Supp. 1255 (E.D.Pa.1992).

On appeal, defendants argue that oversight costs incurred by the government are not recoverable under CERCLA § 107; thus, they suggest that they are not liable for most of the government's costs, including all those incurred after February 4, 1987. In addition, defendant CP argues that it should not be jointly and severally liable for the full costs incurred by the government. We have appellate jurisdiction over this case pursuant to 28 U.S.C. § 1291, and because there are no disputed facts on appeal and the resolution of the case turns exclusively on matters of law, our review is plenary.

## II. Statutory Context

### A. *RCRA*

The Resource Conservation and Recovery Act ("RCRA") was originally passed in 1976. Its primary purpose is regulatory: to regulate the storage, transportation, and disposal (STD) of hazardous wastes through a permit system. To obtain a treatment, storage or disposal permit, an applicant must demonstrate that it will conduct its activities in compliance with strict standards. RCRA's permitting program is prospective. It applies only to active STD facilities and to STD facilities that closed after November 19, 1980.

RCRA has been amended several times since its enactment, and as part of its intended "cradle-to-grave" regulatory system for hazardous waste, the statute contains a number of provisions designed to correct the problems posed by existing hazardous waste. These provisions contemplate monitoring and "corrective action" to be performed and paid for by private parties.

Section 3013 of RCRA, adopted in 1980, gives EPA the right to order owners or operators to monitor, test, and analyze facilities in order to ascertain the extent of any environmental hazards. If the owner is unable to do so to EPA's satisfaction, EPA can perform the work itself and have its costs reimbursed from the owner. If EPA conducts its own testing and such tests confirm the results of testing conducted by a private party pursuant to an EPA order, EPA cannot order the party to reimburse EPA's costs. *See* 42 U.S.C. § 6934 (1988).

Section 7003 of RCRA, the "imminent hazard" provision of RCRA, has existed since RCRA's initial enactment in 1976 but was enhanced by amendments in 1980 and 1984. If EPA finds that any solid or hazardous waste presents an "imminent and substantial endangerment to health or the environment," the current version of the statute permits EPA to bring suit to force any person who has contributed, or is contributing, to the problem to take appropriate corrective action. The section also permits EPA to issue administrative orders as necessary. *See* 42 U.S.C. § 6973 (1988).

The RCRA corrective action program, added to the statute by the Hazardous and Solid Waste Amendments of 1984, is designed to identify and remedy environmental contamination at all facilities that hold hazardous waste permits under RCRA. Specifically, RCRA § 3004(u) mandates that all RCRA permits issued after November 8, 1984, must require the permittee to take "corrective ac-

---

**3.** According to the district court, as of June 18, 1991, costs of $385,587.41 had been incurred by the government since 1979 ($379,063.45 by EPA and $6,523.96 by the Department of Justice), and interest on the amount had reached $15,761.37 resulting in a total amount of $401,348.78.

**4.** The costs incurred by the government include both direct costs (i.e. hiring contractors to provide sampling support and field investigation) and indirect costs (i.e. travel costs, payroll, hiring contractors to review the work of R & H–DVI and its contractors). Prior to February 4, 1987, EPA incurred $173,409.59 in costs; after that date, $205,653.83 was incurred.

tion for all releases of hazardous wastes or hazardous constituents from any solid waste management unit" located at the permitted facility "regardless of the time at which waste was placed in the unit." 42 U.S.C. § 6924(u) (1988). Other provisions of the 1984 amendments authorize EPA to require corrective action through the issuance of administrative orders. *See* 42 U.S.C. § 6928(h) (1988). The corrective action program is applicable to every facility required to have a RCRA permit, which includes most major industrial facilities in the United States. Given the scope of the RCRA corrective action program and the thousands of facilities involved,[5] it is not surprising that EPA oversight of private corrective action activities involves substantial expense.

### B. *CERCLA*

CERCLA was passed in December 1980 during the closing days of the Carter administration in response to the Love Canal controversy.[6] CERCLA's primary purpose is remedial: to clean up hazardous waste sites. EPA is required to identify and prioritize releases and threatened releases of hazardous waste by promulgating a National Priority List (NPL). CERCLA provides what essentially are two separate mechanisms for cleaning up waste sites: a government conducted cleanup under CERCLA § 104 followed by a cost recovery action under § 107, and a private party cleanup, ordered by EPA, pursuant to CERCLA § 106. *See, e.g.,* 2 Susan M. Cooke, *The Law of Hazardous Waste*, § 12.02[4], at 12–20 (1993) ("As an alternative to a governmental response action followed by a cost recovery action, CERCLA authorizes EPA, by administrative order or judicial action, to compel responsible parties to perform the required response action.");

*see also id.* § 14.02[1][c]. EPA's authority under § 104 and § 106 is not limited to activities at sites listed on the NPL.

CERCLA § 106 authorizes EPA to sue private parties, or issue administrative orders, in order to compel such parties to cleanup hazardous waste sites at their own expense. Section 106 is therefore very similar to RCRA § 7003,[7] and is also somewhat similar to RCRA § 3008. *See* 42 U.S.C. § 9606 (1988). Section 106 orders are often entered into consensually following negotiation between EPA and the responsible parties. *See* 42 U.S.C. § 9622 (1988) (regarding settlements). Indeed, § 106 consent orders appear to be the favored method of cleaning up waste sites since they generally are quicker and involve less government expense than cleanups conducted by the government pursuant to § 104. *See* 42 U.S.C. § 9622(a) (indicating congressional preference for settlements in order to "expedite effective remedial actions and minimize litigation"); H.R.Rep. No. 253, 99th Cong., 1st Sess. (1985) ("Negotiated private party actions are essential to an effective program ... and it is the intent of this Committee to encourage private party cleanup at all sites.... [N]egotiated clean-ups will accelerate the rate of clean-ups and reduce their expense by making maximum use of private sector resources."); Bradford F. Whitman, *Superfund Law and Practice*, at 208 (1991) (discussing EPA's preference for settlements); *see also* 3 Cooke, *supra,* § 15.01[8][b].

Section 104(a) of CERCLA, 42 U.S.C. § 9604(a), authorizes the government, in certain circumstances, to undertake removal or remedial actions in response to a release or threat of release of hazardous substances, contaminants, or pollutants.[8] Section 107 im-

---

5. We are told that more than 4,600 facilities nationwide are in the RCRA permitting universe.

6. Numerous courts have complained about the inartful, confusing, and ambiguous language and the absence of useful legislative history. *See, e.g., Exxon Corp. v. Hunt*, 475 U.S. 355, 363, 106 S.Ct. 1103, 1109–10, 89 L.Ed.2d 364 (1986) (CERCLA is "not a model of legislative draftsmanship"); *United States v. Alcan Aluminum, Corp.*, 964 F.2d 252, 258 n. 5 (3d Cir.1992) ("[T]he statute is riddled with inconsistencies and redundancies.").

7. *See, e.g.,* 2 Cooke, *supra,* § 14.02[3][c] (comparing RCRA § 7003 to CERCLA § 106 and noting the similarities); 3 *id.* § 15.01[11][c] (same).

8. "Payment of governmental response costs incurred pursuant to section 9604" may be made from the Superfund. 42 U.S.C. § 9611(a)(1) (1988). The Superfund is financed by a variety of sources including an environmental tax, a direct appropriation from general revenue, and certain monies recovered by the government through CERCLA actions and orders. *See* 26 U.S.C. § 9507 (1988). In addition to payment of

poses liability for the costs of such activities on certain responsible private parties. 42 U.S.C. § 9607(a) (1988). Specifically, the section provides in part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses [hereinafter enumerated] . . . the owner and operator of a vessel or a facility [and any other responsible party] . . . shall be liable for—
>
> (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan; . . . .

*Id.* In general, removal actions are short term responses to a release or threat of release while remedial actions involve long term remedies. The statute defines both terms with specificity.

The parties agree that, if the government oversight activities involved here are included under this definition, it would be because they are "removal," rather than "remedial," activities. "Removal" is defined as follows:

> [1] the cleanup or removal of released hazardous substances from the environment, [2] such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, [3] such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, [4] the disposal of removed material, or [5] the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. This term includes, in addition, without being limited to, . . . action taken under section 9604(b) of this title [§ 104(b) of CERCLA], and any emergency assistance which may provided under the Disaster Relief and Emergency Assistance Act.

42 U.S.C. § 9601(23) (1988).

### C. *The Anatomy of a Corrective Action*

The statutory framework, as well as logic, dictate that a response to a release of haz-

ardous substances generally consists of three basic steps: assessment, response formulation, and execution. At the assessment stage, there is an evaluation of the nature and the extent of the release and of the risk it poses to the public health and the environment. Various testing, investigations, and studies may be necessary, *see, e.g.,* CERCLA § 104(b), 42 U.S.C. § 9604(b) (1988); RCRA § 3013, 42 U.S.C. § 6934 (1988), and both RCRA and CERCLA have provisions allowing EPA access to the facility in question and to the records of potentially responsible parties. *See* RCRA § 3007, 42 U.S.C. § 6927 (1988); CERCLA § 104(e), 42 U.S.C. § 9604(e) (1988). Under CERCLA, EPA typically prepares a Preliminary Assessment (PA), and under RCRA, EPA prepares a RCRA Facility Assessment (RFA).

Based on the information gathered, some sort of response may be appropriate. Critical to this determination under CERCLA is a Remedial Investigation and Feasibility Study (RI/FS) which identifies, evaluates, and compares alternative approaches to remediation. The typical RCRA process involves roughly analogous steps, namely a RCRA Facility Investigation (RFI) and a Corrective Measures Study (CMS). The RI portion of the RI/FS, as well as the RFI, generally involves considerable investigation and testing in order to better formulate and analyze approaches to the problem. Ultimately, a plan is devised that, hopefully, will effectively and efficiently eliminate or ameliorate the risk. *See* 42 U.S.C. § 9621 (1988). Depending in part on the urgency of the situation, a short-term removal action may be necessary, even before the RI/FS is completed. *See, e.g.,* 40 C.F.R. § 415 (1992) (guidelines on removal action). Similarly, under RCRA, Interim Measures (IM) may be deemed appropriate.

Finally, the designated response plan is implemented in the field. As previously noted, under CERCLA the plan may be executed by EPA or a responsible party. *See* CERCLA §§ 104, 106; 42 U.S.C. §§ 9604, 9606 (1988). Under RCRA, it is generally

---

response costs incurred by the government, the Superfund may also be used for a variety of other

purposes. *See* 42 U.S.C. § 9611 (1988).

the responsible party that performs the corrective action. *See* RCRA §§ 3008(h), 7003; 42 U.S.C. §§ 6928(h), 6973 (1988).

When EPA exercises its authority to take correction action itself, it will, of course, perform virtually all of the work associated with each stage, or more commonly, hire contractors to perform the work. Even when a corrective action is carried out by a private party pursuant to a consent or administrative order entered under § 3008(h) or § 7003 of RCRA, or § 106 of CERCLA, however, EPA plays a significant role—a role that necessarily entails expense.

In order for EPA to determine whether government intervention is even appropriate in a given situation, it is necessary that EPA conduct most, if not all, of the initial assessment. Thus, under both RCRA and CERCLA, the initial assessment of the risk is performed by EPA, through a RFA or PA, respectively.

EPA also plays a necessarily large role in determining what response action is appropriate. Ultimately, it is EPA that decides whether to conduct a response action under CERCLA § 104 or require private corrective action under CERCLA § 106 or RCRA §§ 3008(h), 7003. Although an RI/FS can be conducted by either EPA or the private party, CERCLA places limitations on a privately conducted RI/FS: a responsible party can only conduct the RI/FS if EPA determines that the party is qualified to do so, if EPA "contracts with or arranges for a qualified person to assist [it] in overseeing and reviewing the conduct of such RI/FS," and if the party agrees to reimburse the government for any cost incurred with oversight of the RI/FS. *See* 42 U.S.C. § 9604(a)(1) (1988).[9] EPA also generally oversees RFI's and CMS's conducted by private parties pursuant to RCRA.

Private parties have potentially the greatest role in executing the agreed upon response action. However, even during the execution of the agreed upon response plan by the private party, EPA plays a role by overseeing the performance of the private party to assure that the plan is being executed as intended.

### III. Contentions of the Parties.

EPA's position is straightforward. Its oversight of R & H–DVI's activities, including its oversight of activities required by the RCRA corrective action order, literally comes within the definition of a "removal" action and that oversight was concededly not inconsistent with the national contingency plan; thus, the defendants are liable under § 107(a). While it is true that RCRA itself does not authorize EPA recovery of the cost of oversight conducted under RCRA, that fact is legally irrelevant since § 107(a) imposes liability for removal actions "notwithstanding any other provision or rule of law, and subject only to the defenses" enumerated in CERCLA.

Defendants respond that EPA does not here seek the recovery of removal costs as defined in CERCLA for two reasons: oversight of a private party's removal and remedial activities is not itself a removal action, regardless of what statutory authority is invoked, and, even if § 107(a) of CERCLA does contemplate government recovery of costs incurred overseeing a private party response action ordered under CERCLA, it does not impose liability for the cost of overseeing activities conducted under RCRA.

Given these competing positions, it is important to note what is *not* argued, and thus, what is not at stake here. As we have noted, EPA acknowledges that RCRA contains no authority for it to recover the expenses it incurred in overseeing corrective action ordered under RCRA. Thus, the defendants can be held liable, as EPA claims they must be, only if Congress intended to impose liability in these circumstances when it adopted § 107(a) of CERCLA. On their part, defendants acknowledge that facilities subject to regulation under RCRA may, in certain circumstances, be subject to government removal and remedial action under CERCLA and, in such event, the responsible private

---

9. Where a private party is to conduct the RI/FS, it is common that the terms of the agreement be memorialized in a Consent Order entered into between the potentially responsible party and EPA under authority of CERCLA §§ 104(b), 122(a), and 122(d)(3).

parties may be liable for the government's costs under § 107(a) of CERCLA.

Finally, we note that this case does not involve the issue of whether indirect, overhead costs associated with government removal or remedial activity at a particular facility are recoverable under § 107(a).[10] Here we are concerned with the more fundamental issue of whether the government's oversight of a cleanup paid for and conducted by private parties constitutes a government removal at all.

## IV. Discussion

### A. NCTA Doctrine

■ Before turning to the relevant statutory language, it is necessary for us to determine what standard should be used in examining that language. Defendants argue that in order for us to find that oversight costs are recoverable, there must be a clear congressional intent, reflected in the language of the statute, to impose upon a party oversight costs incurred by EPA. In support of this proposition, they rely on *National Cable Television Ass'n, Inc. v. United States,* 415 U.S. 336, 342, 94 S.Ct. 1146, 1149–50, 39 L.Ed.2d 370 (1974), a case later interpreted by the Supreme Court as standing for the proposition that "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to

the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties." *Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 224, 109 S.Ct. 1726, 1734, 104 L.Ed.2d 250 (1989); *see also FEA v. Algonquin SNG, Inc.,* 426 U.S. 548, 559 n. 10, 96 S.Ct. 2295, 2302 n. 10, 49 L.Ed.2d 49 (1976).

The oversight costs here at issue are costs incurred by the government in monitoring private parties' compliance with their legal obligations. Moreover, this oversight is intended to protect the public interest rather than the interests of those being overseen. Thus, the oversight costs involved here are "administrative costs" of the kind discussed in *NCTA,* i.e., "administrative costs not inuring directly to the benefit of regulated parties" but rather to the public at large. Accordingly, defendants contend that a clear statement of congressional intent is required for EPA to recover. The government,[11] however, contends that the *NCTA* doctrine is inapplicable here because *NCTA* involved a narrow and distinguishable set of circumstances, namely: "an agency's prescription, by regulation, of a fee for services absent a congressional delegation of taxing authority and absent proof that the regulated parties received agency services." U.S. Br. at 16.

Although *NCTA* involved circumstances somewhat different from those now presented to us,[12] neither the rationale of *NCTA* nor

---

10. A number of courts have held that where EPA undertakes removal or remedial action under CERCLA § 104(a), it may recover from a responsible party both the direct and indirect costs attributable to its actions. *See, e.g., United States v. R.W. Meyer, Inc.,* 889 F.2d 1497 (6th Cir.1989) (overhead costs allocated on the basis of the hours spent by EPA regional personnel on the response actions at the particular site are recoverable), *cert. denied,* 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).

11. The government argues that this issue was not raised at trial and notes that *NCTA* was not cited to the district court; thus, defendants should not be permitted to raise *NCTA* now. We do not agree. The record is clear that the defendants did argue to the district court that without statutory authority (authority which it contended was lacking here), EPA could not recover the costs in question. Thus, the defendants' reliance on *NCTA* here is not a matter of a completely new claim or defense being raised; rather, it is more

akin to a party's offering additional case law support for propositions presented to the district court. In addition, *NCTA* involves the fundamental issue of what sort of congressional indication is necessary for us to impose liability. Because ignoring *NCTA* might lead us to an erroneous construction of the relevant statutes and thereby adversely affect many other parties in a situation similar to the defendants here, we think it particularly important to consider the Supreme Court's guidance on how to interpret statutes in cases like this.

12. The question in *NCTA* was whether a regulatory agency, authorized to charge and collect fees from the regulated entities, could base those fees on the agency's total costs. The Court held that it could not, because some of the agency's activities were for the public benefit and not for the benefit of the regulated entities. The "fee" could only reflect the benefit conferred on the regulated entity; to the extent that the fee was used to further the benefit of the public, it was

the statement in *Skinner*[13] is confined to that narrow set of circumstances. We believe the guiding principle of *NCTA* to be a sound one, particularly as applied in this case. The budget and appropriation process gives executive agencies an incentive to operate efficiently and makes them accountable to the Congress. When an agency asserts the right to secure financing of its activities by assessing its costs against those whom it regulates, that incentive and accountability are lost. Moreover, in the present context, recognition of the authority EPA asserts could result in the funding for a substantial amount of EPA activity, undertaken under a variety of different statutes, being shifted away from general revenue to specific levies on certain private parties. While it is not the role of the judiciary to determine whether such a change constitutes wise public policy, it *is* our duty to ascertain congressional intent behind statutory language. We will not presume Congress to have intended a statute to create the dramatic and unusual effect of requiring regulated parties to pay a large share of the administrative costs incurred by the overseeing agency unless the statutory language clearly and explicitly requires that result.[14] Thus, EPA can only prevail if the statutory definition of removal unambiguously allows for the government to recover the oversight costs it here seeks.

## B. *CERCLA § 107's Applicability to RCRA Costs*

■ Defendants note that most of the oversight costs in question here were in-

curred by the government in overseeing a RCRA § 3008(h) Consent Order. They argue that RCRA and CERCLA represent two distinct statutory schemes and that costs incurred pursuant to RCRA are not recoverable under CERCLA § 107. In the defendants' view, costs which would be removal costs if incurred under CERCLA are nevertheless not removal costs if incurred under RCRA. We are unpersuaded.

Section 107(a) expressly stipulates that "*all* costs of removal ... incurred by the United States Government" are recoverable, and neither it nor the definition of "removal" contains CERCLA specific language. 42 U.S.C. §§ 9601(23), 9607 (emphasis added). Moreover, § 107(a) expressly provides for the situation in which more than one statutory scheme purports to provide a governing rule. The opening clause—"notwithstanding any other provision or rule of law"—decrees that where another statute, as well as § 107(a), is applicable, the liability provisions of § 107(a) will prevail even where the commands of the two statutes are in conflict. It follows that if both RCRA and CERCLA read on the situation before us, the fact that RCRA provides no authority for assessing government oversight costs could take nothing away from any authority found in § 107(a) for such assessment. Thus, if a particular government action qualifies as a "removal action" under the definition contained in CERCLA, the government's costs are recoverable under the unambiguous lan-

more appropriately considered a tax and required explicit congressional authorization. In *NCTA*, as here, Congress contemplated that the agency would recover monies from the regulated parties; the question was whether recovery could include a large portion of the agency's administrative and regulatory costs.

13. "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties." *Skinner v. Mid–America Pipeline Co.*, 490 U.S. 212, 224, 109 S.Ct. 1726, 1734, 104 L.Ed.2d 250 (1989).

14. Because only a clear congressional statement will be sufficient for us to impose an agency's costs on a regulated private party, the usual

deference accorded a reasonable agency interpretation of an ambiguous statutory provision is inapplicable. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). We question whether deference to EPA's interpretation would be appropriate in these circumstances in any event since EPA did not explicitly adopt the position that it could recover its RCRA oversight costs under CERCLA until after this case was filed, more than a decade after CERCLA was enacted. *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

guage of § 107, regardless of what statutory authority was invoked by EPA in connection with its action.

We find no support in the text or legislative history of CERCLA for the suggestion that identical oversight activity on the part of the government should be considered a removal if the government invokes CERCLA, but not a removal if other statutory authority is invoked. Moreover, given the similarity of the provisions of RCRA and CERCLA authorizing EPA to order private parties to conduct corrective activity, we fail to perceive any reason why Congress might have wished to make government oversight expenses recoverable if the government invoked CERCLA statutory authority, but not if it invoked RCRA.[15]

### C. *The Definition of Removal*

■ Given our conclusion that a "removal" is a removal whether it is undertaken pursuant to CERCLA or another statute, the key issue becomes: should CERCLA's definition of "removal" be read to encompass the government's activity in overseeing removal or remedial action paid for and conducted by private parties?[16] If such oversight activity may properly be characterized as a government removal action, then the government is entitled to recover the costs of that oversight pursuant to § 107(a) whether the oversight was conducted under RCRA or any other statutory authority. On the other hand, if we conclude that CERCLA's definition of "removal" should not be read to include the sort of oversight activity in question, then § 107(a) does not allow government recovery of the costs incurred in conducting such oversight activity. In making our determination, we must keep in mind that under *NCTA*, the government may recover the oversight costs it here seeks only if Congress clearly intended that such costs be recoverable; any ambiguity must be resolved in favor of the defendants.

### 1.

Nowhere in the definition of removal is there an explicit reference to oversight of activities conducted and paid for by a private party. Nowhere is there an explicit statement that Congress considers administrative and regulatory costs incurred overseeing the removal and remedial actions of a private party to be removal costs in and of themselves. Nevertheless, EPA contends that the requisite clear statement of congressional intent as to the recoverability of oversight costs may be found in the third of the five categories in the definition of "removal," i.e., "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances."

Examined in a vacuum, this language could be understood to encompass at least some oversight of the activities of a private party, particularly private activities focusing on assessment of the risk. On the other hand, it is at least as plausible to read this language as referring only to actual monitoring of a release or threat of release rather than over-

---

**15.** We note that a number of courts have held defendants liable for costs of removal or remedial action even where such costs were not incurred pursuant to CERCLA's statutory authority. *See, e.g., Chemical Waste Management, Inc. v. Armstrong World Industries*, 669 F.Supp. 1285 (E.D.Pa.1987) (holding costs of private party removal of hazardous waste to be recoverable from another private party under § 107); *Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049 (D.Ariz.1984) (same), *aff'd*, 804 F.2d 1454 (9th Cir.1986); *United States v. Kramer*, 757 F.Supp. 397, 420–22 (D.N.J.1991) (holding recoverable under § 107 government expenditures not authorized under CERCLA § 104); *United States v. Wade*, 577 F.Supp. 1326 (E.D.Pa.1983) (same); *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726 (8th Cir.1986) (holding recoverable costs of literal removal of waste incurred by the government prior to enactment of CERCLA), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Shell Oil Co.*, 605 F.Supp. 1064 (D.Colo.1985) (same).

**16.** In support of their position that Congress did not intend RCRA oversight costs to be reimbursable under § 107 of CERCLA, defendants raise a number of arguments that seem to suggest that Congress did not intend RCRA oversight costs to fall within the government's cost-recovery authority. While these arguments do not, in our view, counteract the clear language of § 107(a) which allows for recovery of removal costs even if the removal action is conducted under RCRA rather than CERCLA, they *are* relevant in ascertaining whether Congress intended that oversight costs be considered removal costs.

sight of the monitoring and assessment activities of others. This latter reading would be consistent with an understanding of the definition that distinguishes at all stages—assessment, response formulation, and execution—between actions taken to define the scope of the risk created by a release or threatened release and actions taken to evaluate the performance of others to determine whether they are meeting their legal obligations. We believe a reading of the statutory definition that embraces this distinction is linguistically the more plausible one.[17] Moreover, when we expand our inquiry to a consideration of the other provisions of CERCLA and to the place of CERCLA in the landscape of federal environmental legislation, we find additional support for the view that this reading was the intended one. All things considered, we cannot say that clause [3] of the removal definition is sufficient to constitute the clear statement of intent required by NCTA.

### 2.

Given the context in which CERCLA was enacted, we find it highly significant that Congress omitted any mention of oversight, or of government activities conducted under § 106, in the definition of removal. As noted earlier, when Congress enacted § 104(a) and § 107 of CERCLA, it contemplated a mechanism by which the government would perform cleanups of hazardous waste and then seek reimbursement from the parties; in addition, however, Congress created a second mechanism by which the problems of hazardous waste releases might be ameliorated. In passing § 106, Congress contemplated suits and administrative orders to force private parties to clean up waste at their own ex-

pense. This concept of forcing responsible parties to conduct the necessary removal or remedial action was already familiar to Congress as evidenced by the similar mechanism present in RCRA § 7003, 42 U.S.C. § 6973 (1988).

In addition to the preexisting congressional preference for private corrective action, it seems to us significant that, so far as we have been able to determine, no environmental statute predating CERCLA authorized imposition upon the regulated parties of EPA's regulatory cost of monitoring compliance with the law. As we have noted, there is no provision in RCRA for the general recovery of costs incurred by the government in overseeing corrective actions at the thousands of RCRA licensed sites.

When Congress passed CERCLA, and when it amended the statute in 1986, it undoubtedly was aware that pursuant to CERCLA § 106 as well as other statutes, EPA would be forcing numerous private parties to conduct removal and remedial activities and overseeing the implementation of its directives.[18] Indeed, given the congressional preference for settlements and § 106 consent orders expressed in § 122(a), it might be expected that removal and remedial activity conducted and paid for by private parties would be much more common than the government cleanups contemplated in CERCLA § 104(a). *See* 42 U.S.C. § 9622(a) (1988). Given the extent of this expected private activity and the established prior practice of financing oversight activities from appropriated funds, a directive that EPA would henceforth be able to recover all of the costs of overseeing private corrective actions under any applicable environmental statute

---

**17.** EPA's argument would be stronger in our view if it were predicated on the fifth, catchall category of the removal definition—"the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." Arguably, this language is broad enough to include EPA's oversight of R & H–DVI's activities. However, we believe that it is at least reasonable to read this language as referring to actions of the same character as those described in the first four categories—other actions to deal with the risk created by the re-

lease or threat of release and not actions to oversee the performance of those who have undertaken to deal with that risk.

**18.** In fact, provisions which allow EPA to force private parties to undertake corrective action at their own expense is a favorite policy tool of Congress and one that can be found in a number of environmental statutes. *See, e.g.,* RCRA § 3008(h), 42 U.S.C. § 6928(h) (1988); Federal Clean Water Act § 311(e), 33 U.S.C. § 1321(e) (1988); Safe Drinking Water Act § 1431, 42 U.S.C. § 300i (1988).

would represent a major policy change. We find it difficult to believe that Congress would choose to manifest such a change solely by including in CERCLA's definition of removal a reference to "such actions as may be necessary to monitor, assess, and evaluate the release of threat of release of hazardous substances."

We think it far more likely that Congress viewed EPA's overseeing of a private party's removal activities as qualitatively different from EPA's actually performing removal activities and intended for EPA to recover the costs of the latter but not the costs of the former. Had its view and intent been otherwise, we are confident that it would at least have made some reference to government activity under § 106 when it was carefully providing examples of removal actions at the conclusion of the definition.[19]

### 3.

Turning from that which Congress omitted to that which it saw fit to include, various statutory provisions, as well as the general structure of CERCLA, suggest to us that Congress did not intend to include oversight in the definition of removal. Although the primary function of § 104(a) of CERCLA is to authorize removal and remedial action by the government, it also permits EPA to allow responsible parties to carry out necessary removal and remedial actions so long as EPA finds that "such action will be done properly and promptly." However, the section also provides that:

> No remedial investigation or feasibility study (RI/FS) [by a responsible party] shall be authorized except on a determination by the President [20] that the party is qualified to conduct the RI/FS and only if the President contracts with or arranges for a qualified person to assist the President in overseeing and reviewing the conduct of such RI/FS and if the responsible

party agrees to reimburse the Fund for any cost incurred by the President under, or in connection with, the oversight contract or arrangement.

42 U.S.C. § 9604(a) (1988). An RI/FS is an "investigation" of the type contemplated in § 104(b) and is clearly a removal action. If Congress considered government oversight of a private removal action to be a removal action in itself, the provision of § 104(a) requiring reimbursement of costs incurred by the government overseeing the private RI/FS would be unnecessary as § 107(a) would authorize the recovery of such oversight costs. Even more significant is the fact that although § 104(a) authorizes EPA to permit private parties to undertake all kinds of removal and remedial actions, it only discusses government oversight, and reimbursement for such oversight, with regard to RI/FS's. Had Congress intended the government's cost of overseeing private party removal and remedial activity other than RI/FS's to be recoverable, surely it would have added something to § 104(a) to manifest that intent.

Equally strong evidence of Congress's intent concerning oversight costs can be found in § 111 of CERCLA. That section sets forth six different categories of payments that can be made from the Superfund. The first, found in subsection (a)(1), is "Payment of governmental response costs incurred pursuant to [§ 104]." "Response costs" consist of "removal" and "remedial" costs. 42 U.S.C. § 9601(25) (1988). A fourth, and separate, category of authorized Superfund payments is found in subsection (a)(4)—"Payment of costs specified under subsection (c) of this section." Subsection (c) of § 111 lists in excess of fourteen items of costs that can be funded from the Superfund. Subsection (c)(8) designates as appropriate Superfund charges:

---

19. The definition of removal includes certain action taken under the Disaster Relief and Emergency Assistance Act as well as action taken under CERCLA § 104(b). In addition, provisions added to *RCRA* in 1984 allow the government to order the Toxic Substances and Disease Registry to undertake health assessments and explicitly provide that the cost of those assess-

ments are recoverable as a response cost under § 107. *See* 42 U.S.C. § 6939a(b), (g) (1988).

20. The President has delegated most of his authority under CERCLA to EPA. *See, e.g., United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir.1992).

[t]he costs of contracts ... entered into under section 9604(a)(1) of this title [CERCLA § 104(a)(1) ] to oversee and review the conduct of remedial investigations and feasibility studies undertaken by persons other than the President and the costs of appropriate Federal and State oversight of remedial activities at National Priorities List sites resulting from consent orders or settlement agreements.

42 U.S.C. § 9611(c)(8) (1988). If EPA's costs of overseeing removal or remedial activities were in themselves removal costs, they would be covered under the provision allowing EPA to use Superfund funds for "payment of governmental response costs" and § 9611(c)(8) would be unnecessary. Moreover, it seems apparent to us that the drafters of subsection (a) of § 111 viewed the items included by virtue of subsection (a)(4) as qualitatively different from those included in subsection (a)(1).

In summary, while CERCLA § 104 is concerned almost exclusively with government cleanups of hazardous waste, CERCLA § 106, RCRA § 7003, RCRA § 3008(h), as well as other statutes are concerned almost exclusively with private cleanups. The government's role in overseeing a private cleanup effort is far removed from any sort of literal government "removal" or activity peripherally connected to such removal. CERCLA § 107 appears to have been drafted primarily with CERCLA § 104 in mind; its cost recovery provisions allow recovery of all costs of government removal and remedial activity (i.e. the activity explicitly authorized by § 104(a)) as well as the costs of investigatory activity of the type authorized by § 104(b). On the other hand, there is no clear indication in § 107, § 104, the definition of removal, or § 106 that government oversight actions conducted in connection with § 106 (or RCRA §§ 3008(h), 7003) were intended to be recoverable removal costs.[21]

Accordingly, we find the clear indication mandated by *NCTA* to be lacking and hold that the United States is not entitled to recovery of the oversight costs it seeks.

### D. *Recoverable Costs*

Given our conclusion, the district court decision allowing the government recovery of all its costs, including oversight costs, cannot stand. A remand is necessary for the district court to reconsider the government's costs and determine which, if any, are reimbursable. We, of course, leave to the discretion of the district court whether it would be helpful to afford the parties an additional opportunity to offer evidence regarding the character of the costs in question.

▄▄▄ To assist the district court in carrying out this task, we conclude our discussion regarding oversight costs by further elucidating what we perceive to be the statutory distinction between recoverable and non-recoverable costs. Where the government takes direct action to investigate, evaluate, or monitor a release, threat of release, or a danger posed by such a problem, the activity is a "removal" and its costs are recoverable. *See* 42 U.S.C. § 9604(b) (1988). This includes the costs, no matter at what stage incurred, of ascertaining whether and to what extent the risk has been reduced or eliminated by the chosen response. Similarly, if the activity is intended to enable EPA to formulate a position on what would be the most appropriate response action at a given facility, the cost is recoverable. Thus, as we have seen, the costs of conducting an RI/FS are recoverable. *See* 42 U.S.C. § 9604(b) (1988). In addition, although the cost of overseeing an RI/FS is not a "removal cost," that cost is also recoverable in accordance with the congressional intent reflected in § 104(a). *See* 42 U.S.C. § 9604(a) (1988).[22] Even at the execution stage, the costs of activity associated with directing government removal and remedial action are recovera-

---

**21.** *Cf.* 2 Cooke, *supra,* § 14.02[5][g], at 14–239 ("Section 106 does not appear to contemplate either the incurrence or the recovery of governmental 'response costs.' "). Indeed, we note that § 106 contains its *own* remedies separate and apart from those contemplated in § 107. Section 106 provides for penalties for failure of a private party to adequately comply with EPA's directives. *See* 42 U.S.C. § 9606(b) (1988).

**22.** However, because the costs of overseeing an RFI or CMS are not removal costs and because Congress has not specifically provided for government recovery of those costs, those costs are non-recoverable.

ble.[23] *See* 42 U.S.C. § 9604(b) (1988) (authorizing studies and investigations "necessary or appropriate to plan and direct response actions").

■ On the other hand, if what the government is monitoring is not the release or hazard itself, but rather the performance of a private party, the costs involved are non-recoverable oversight costs. Costs of this type would include the costs of contractors hired by EPA to review the plans and work of a private party or its agents executing a response action. Because orders under CERCLA § 106 or RCRA § 3008(h) generally involve private removal and remedial activity rather than government removal and remedial activity, costs incurred by the government in connection with administering such orders normally will not be recoverable removal costs.[24]

### V. Chemical Properties Challenge

In addition to joining the arguments raised by the other defendants, Chemical Properties ("CP") argues before us that it should not be jointly and severally liable for the government's costs at the Bristol Township site. It makes three separate arguments that all revolve around a common theme: CP should not be jointly and severally liable where it owns only a small part of the facility and was not shown to have disposed of any hazardous wastes at its portion of the site.

### A.

■ Section 107(a)(1) of CERCLA imposes liability for response costs on "the owner and operator of a vessel or a facility." 42 U.S.C. § 9607(a)(1) (1988). CP's first argument is that because it owns less than 10% of the contaminated area, it is not "the owner"

of the facility and thus cannot be liable for response costs under § 107. We disagree.

Under CP's view, § 107 liability predicated on current ownership can only exist where the defendant owns the entire facility because each owner in a multiple-ownership situation is merely "an" owner and not "the" owner. Thus, for facilities with multiple owners, *no one* is liable under the "current ownership" prong of § 107. CP suggests that this seemingly anomalous result makes sense because Congress may have intended that EPA, when faced with a release involving several disparately owned properties, define each property as a facility and bring multiple enforcement proceedings. We find this explanation unsatisfying. First, we think it evident from the broad statutory definition of "facility"[25] that Congress did not intend EPA to be straight-jacketed in this manner in situations involving a release transcending property boundaries. Second, even if Congress contemplated that EPA's enforcement authority would be so constrained, CP's reading of the statute would still result in no "current ownership" liability in any situation where more than one individual or firm own an undivided interest in a single property.

We decline to attribute to Congress an intention to distinguish between single owner and multiple owner situations. A current owner of a facility may be liable under § 107 without regard to whether it is the sole owner or one of several owners.

While we reject CP's first argument, we do recognize that holding the owner of a small portion of the site jointly and severally liable for response costs for the whole site may

---

**23.** Action of this type would include government supervision of private contractors that it hires and pays to conduct removal action. The costs of such supervision are materially different from the oversight costs we here find to be non-recoverable. Those costs of supervision are analogous to the costs of supervision incurred by a private party responsible for a cleanup when its agents supervise the activities of its employees or its independent contractors. The oversight costs here held to be non-recoverable are incurred at a different level of supervision. They are the costs of overseeing the performance of the entity that has assumed responsibility for the cleanup.

**24.** RCRA costs nevertheless may be recoverable under some circumstances. For instance, RCRA

permits EPA, in certain instances, to conduct "monitoring, testing, or analysis ... to ascertain the nature and extent of the hazard associated with the site concerned." 42 U.S.C. § 6934(d)(1) (1988). Such activity is similar to that authorized by § 104(b), 42 U.S.C. § 9604(b) (1988), and may be considered a removal action; its costs might therefore be recoverable in an action brought under § 107.

**25.** *See* 42 U.S.C. § 9601(9) (1988) (defining "facility" to include "any building, structure, installation, ... pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, ... [or] any site or area").

involve some unfairness. However, the solution to this potential unfairness is apportionment and contribution in appropriate circumstances. Indeed, the propriety of apportionment in this case is the focus of CP's second argument.

### B.

■ In *United States v. Alcan Aluminum Corp.,* 964 F.2d 252 (3d Cir.1992), we noted that although joint and several liability is generally appropriate in § 107 actions, apportionment may be warranted in certain circumstances. More specifically, we relied on § 433A of the Restatement (Second) of Torts in holding that "[d]amages for harm are to be apportioned among two or more causes where ... there is a reasonable basis for determining the contribution of each cause to a single harm." *Id.* at 268 (quoting Restatement (Second) of Torts § 433A). However, we also held that it is the *defendant*'s burden to prove "that the harm is divisible and that the damages are capable of some reasonable apportionment." *Id.* at 270. This, CP failed to do.[26]

■ CP suggests to us that two factors support apportionment in this case: CP owns only 10% of the land area of the facility and most, if not all, of the waste was apparently disposed of by R & H and R & H–DVI prior to CP's purchase of the site. With regard to the first factor, we decline to hold that simply showing that one owns only a portion of the facility in question is sufficient to warrant apportionment. In order to warrant apportionment, a defendant cannot simply provide some basis on which damages may be divided up, but rather it must show that there is a *"reasonable* basis for determining *the contribution of each cause to a single harm."* In other words, CP must prove that there is a way to determine what portion of the "harm" (i.e. the hazardous substances present at the

facility and the response costs incurred in dealing with them) is fairly attributable to CP, as opposed to other responsible parties. The fact that CP only owns a portion of the site says nothing about what portion of the harm may fairly be attributed to it.

■ CP's second suggested factor—that most, if not all, of the hazardous substances found on the property were disposed of there by R & H and R & H–DVI—comes closer to warranting apportionment. Indeed, if CP were able to prove that none of the hazardous substances found at the site were fairly attributable to it, we might well conclude that apportionment was appropriate and CP's apportioned share would be zero. However, it is clear from the factual findings of the district court that CP did not prove that none of the harm was attributable to it. Relying in large part on the fact that chemical-carrying trucks were dispatched to and from CP's property and were cleaned and maintained using a wastewater pretreatment plant located on that property, the district court concluded that CP had failed to prove "that the contamination was caused solely by a third party" and that "it is doubtful whether the contamination was caused solely by Rohm & Haas." *United States v. Rohm & Haas,* 790 F.Supp. 1255, 1264 (E.D.Pa.1992).[27] Because CP failed to meet its burden of proof before the district court with regard to a "reasonable basis" for determining the extent of its contribution to the harm, it is not entitled to apportionment.

### C.

■ Finally, CP argues that "equitable principles" require that it not be held jointly and severally liable for the government's response costs at the full 120 acre site. We agree that CP's enjoyment of the benefits of ownership of less than 10% of the site is an "equitable factor" which may suggest that most of the government's recoverable response costs should be borne by someone else. However, equitable considerations are not relevant to the apportionment inquiry under Restatement § 433A and *Alcan Alu-*

---

26. Indeed, we note that CP erroneously attempts to place the burden of proof with respect to divisibility and apportionment on the government. *See, e.g.,* CP Brief at 12 ("In the absence of proof by the government as to the portion of harm that is attributable to Chemical Properties, this Court must hold that Chemical Properties' share of the costs is zero.").

27. Again, we stress that while it is initially the government's burden to prove the elements of CERCLA liability—a burden met, in part, when the government proved that CP was the current owner of part of the facility—it is the defendant's burden to prove that apportionment is warranted.

*minum;* they do not alter CP's joint and several liability. On the other hand, such equitable factors *are* relevant in a contribution action by CP against other responsible parties. Such actions, and consideration of equitable factors by federal courts, are explicitly authorized under CERCLA's statutory scheme. *See* 42 U.S.C. § 9613(f) (1988) (authorizing private contribution actions and permitting courts to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate"); *Alcan Aluminum,* 964 F.2d at 270 n. 29. No contribution claim is currently before us, however. It follows that the district court was correct in holding that CP is jointly and severally liable for any costs that the government is entitled to recover under § 107.

### VI. Conclusion

The judgment of the district court will be reversed and this case will be remanded so that the district court, applying the precepts set forth in this opinion, may determine which, if any, of the government's costs are recoverable under § 107.

### SUR PETITION FOR REHEARING

Oct. 22, 1993.

Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges, and BARRY, District Judge.*

The petition for rehearing filed by appellees in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not

* Honorable Maryanne Trump Barry, United States District Judge for the District of New Jersey,

having voted for rehearing by the court in banc, the petition for rehearing is denied. Judge Becker would have granted rehearing.