**UNITED STATES of America**

v.

**ROHM AND HAAS COMPANY, Rohm and Haas Delaware Valley Inc., Chemical Properties, Inc. and Bristol Township Authority.**

Civ. A. No. 90–7468.

United States District Court,
E.D. Pennsylvania.

April 24, 1992.

Debra L.W. Cohn, James G. Sheehan, U.S. Atty.'s Office, Philadelphia, Pa., Richard B. Stewart, U.S. Dept. of Justice, Asst. Atty. Gen., Environment and Natural Resources Div., Michael D. McIntyre, U.S. Dept. of Justice, Environmental and Enforcement Section, Washington, D.C., for the U.S.

James P. Kimmel, Jr., David Richman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Rohm and Haas Co., and Rohm & Haas Delaware Valley, Inc.

Philip L. Hinerman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Chemical Properties, Inc.

Richard M. Snyder, Begley, Carlin & Mandio, Langhorne, Pa., for Bristol Township Authority.

DECISION UNDER FED.R.CIV.P. 52(a)

LUDWIG, District Judge.

This is a declaratory judgment action under § 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a), to recover EPA oversight costs incurred in substantial part prior to an administrative consent order entered into under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*[1] Jurisdiction is federal ques-

---

1. According to counsel, this is the first action in which the Environmental Protection Agency has sought reimbursement of so-called CERCLA costs for a site that it managed under RCRA. The total amount claimed is $401,348.78, of which about $250,000 represents CERCLA oversight items. A declaration was also requested as

tion. 42 U.S.C. § 9613(b); 28 U.S.C. §§ 1331, 1345. On August 5, 1991, a bench trial was held in which the sole fact issue concerned whether the settlement embodied in the administrative consent order constitutes a bar to this action.

I.

The following facts are part of a pretrial stipulation that comprises most of the fact record for this decision:

1. The Rohm and Haas Landfill Site is an inactive industrial landfill consisting of approximately 120 acres in Bristol Township, Bucks County, Pennsylvania, next to the Delaware River.

2. Rohm and Haas Company, Inc. ("Rohm and Haas") is a specialty chemicals company. Rohm and Haas Delaware Valley, Inc. ("Rohm and Haas DVI") is a wholly owned subsidiary of Rohm and Haas.

3. Between 1917 and 1978, Rohm and Haas owned and operated the Site except as set forth in paragraphs 5 and 6.

4. From 1917 until 1975, Rohm and Haas operated the landfill primarily for the disposal of general refuse, damaged containers, process wastes, and offgrade products generated by Rohm and Haas' two plastics and chemical manufacturing plants adjacent to the Site and by community "clean up/fix-up campaigns."

5. In 1963, Rohm and Haas sold 14.5 acres of the Site to the Bristol Township Authority ("BTA").

6. In 1968 and in 1971, Rohm and Haas sold a total of 10.94 acres of the Site to Chemical Leasing Corporation, now known as Chemical Properties, Inc. (together referred to as "Chemical Properties").

7. In 1969, Chemical Properties obtained soil boring logs for its portion of the Site. Two of the borings indicated "chemical waste." Chemical Properties did no chemical analysis of the borings.

8. After 1970, a tank-truck hauling facility operated at Chemical Properties' portion of the Site which included dispatching, limited maintenance and, during some periods, cleaning tank trucks.

9. In 1978, Rohm and Haas transferred the Site to Rohm and Haas DVI. Since 1978, Rohm and Haas DVI has owned and operated the Site except as set forth in paragraphs 5 and 6.

10. The Site first came to the attention of the Environmental Protection Agency ("EPA") in 1979 when Rohm and Haas reported to a congressional subcommittee that it had disposed of wastes at the Site.

11. EPA placed the Site on the "Potential Hazardous Waste Site Log" on April 15, 1980.

12. On June 4, 1981, Rohm and Haas DVI submitted a Notification of Hazardous Waste Site to EPA stating that Rohm and Haas DVI had disposed of approximately 309,000 tons of waste at the Site, including approximately 750 55–gallon drums of research laboratory wastes. According to Rohm and Haas DVI, 4,600 tons of this drummed liquid waste consisted of hazardous substances as defined by section 101([1]4) of CERCLA, 42 U.S.C. § 9601(14), including an estimated 1,600 tons of flammable solvents carrying water insoluble polymers. Rohm and Haas DVI also stated that it had smashed some containers of research laboratory wastes and mixed the contents in the landfill with an acrylic emulsion.

13. Rohm and Haas DVI hired BCM Eastern Inc. ("BCM"), an environmental consulting firm, to study and sample the environmental conditions at the Site in 1983, including those portions of the Site owned by BTA and Chemical Properties.

14. Since 1979, EPA has sampled and analyzed the substances at the Site and monitored, assessed, and evaluated the activities of Rohm and Haas DVI and BCM at the Site.

15. Numerous hazardous substances have been found at the Site. The presence of approximately thirty CERCLA hazardous substances have been confirmed in

---

to liability for costs incurred after the date of filing of this action, November 23, 1990.

groundwater monitoring wells;[2] and ammonia, which is also a CERCLA hazardous substance, has been found in the portion of Hog Run Creek running through the Site.

16. Air samples, collected directly above the landfill surface, contained concentrations of ethyl acrylate, benzene, toluene, methyl ethyl ketone, methyl acrylate, and xylene, which are hazardous substances within the meaning of section 101(14) of CERCLA, 42 U.S.A. § 9601(14).

17. In 1986, BCM investigated Chemical Properties' portion of the Site. Through tests which included visual inspections and thirty-eight soil borings, BCM found in the subsurface of the soil on Chemical Properties' portion of the Site detectable levels of phenols, cyanide, chromium, lead, toluene, 1,3–dichloroethylene, 1,2–dichloroethylene, chlorobenzene and ethylbenzene.

18. Benzene toluene, trichloroethylene, trans–1,2–dichloroethylene, formaldehyde, and 2,4–dimethylphenol were detected in subsurface waste samples from BTA's portion of the Site.

19. On April 10, 1985, EPA proposed to add the Site to the National Priorities List ("NPL"). 50 Fed.Reg. 14115, 14121, (1985).

20. On August 28, 1986, EPA sent Rohm and Haas DVI a draft consent order under Section 106 of CERCLA, 42 U.S.C. § 9606, requesting that Rohm and Haas DVI conduct, inter alia, a remedial investigation/feasibility study ("RI/FS") at the Site. Rohm and Haas DVI did not sign this consent order. See Exhibit A.

21. EPA continued to monitor the work of Rohm and Haas DVI at the Site, including its preparation of a cleanup investigation.

22. From October 31, 1986 through July of 1987, EPA monitored Rohm and Haas' removal of approximately 11,700 cubic yards of waste and soil from the BTA's portion of the Site which contained hazardous substances.

23. To promote private performance and payment of cleanups of hazardous substances, and to preserve Superfund monies for sites where private sources of payment are unavailable, EPA promulgated a policy whereby facilities, which are subject to both CERCLA and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.* are managed under RCRA and not listed on the NPL, except where the owner or operator of the facility is bankrupt or has demonstrated an unwillingness to undertake corrective action. See EPA, RCRA/NPL Listing Policy, 51 Fed.Reg. 21054, 21057–59 (1986).

24. Thereafter, consistent with the RCRA/NPL Listing Policy and given Rohm and Haas DVI's willingness to negotiate to take corrective action to investigate further and clean up the Site and to pay for that cleanup, EPA decided to manage the Site under RCRA. On February 4, 1987, EPA informed Rohm and Haas DVI that it had decided to manage the Site under RCRA, that new personnel from EPA Region III's Office of RCRA Programs would be assigned, and that CERCLA project officer Jack Kelly would continue to work on the Site. EPA proposed to delete the Site from the proposed NPL on June 24, 1988, 53 Fed.Reg. 23978, 23984 (1988).

25. EPA removed the Site from the proposed NPL on October 4, 1989. See 54 Fed.Reg. 41000, 41012 (1989).

26. One administrative entity within EPA Region III, the Hazardous Waste Management Division and its sole director, oversees both EPA Region III's Office of RCRA Programs and its Office of CERCLA Programs.

27. EPA Region III, through its Office of RCRA Programs, continues to monitor, assess and evaluate the release and threat

---

**2.** The following CERCLA hazardous substances have been detected in the monitoring wells at the Site: bis(2–ethylhexyl) phthalate; trichloroethylene; pyrene; acetone; 2,4–dimethylphenol; 1,1–dichloroethylene; 1,1,1–trichloroethane; trichloroethylene; chloroform; 1,1,2,2–tetrachloroethane; trans–1,2–dichloroethylene; benzene; ethylbenzene; toluene; 1,2–dichlorobenzene; 2– chlorophenol; 4–nitrophenol; p-chloro-m-cresol; pentachlorophenol; phenol; chlorobenzene; 1,1–dichloroethane; tetrachloroethylene; bis (2–chloroethyl) ether; a-endosulfan; heptachlor epoxide; G–BHC (lindane); 1,1,2–tri-chloroethane; naphthalene; formaldehyde; and lead. Joint stipulation of facts at fn. 1.

of release of hazardous substances and Rohm and Haas DVI's activities at the Site.

28. On February 6, 1989, Rohm and Haas DVI and EPA entered into an Administrative Order on Consent under § 3008(h) of RCRA, 42 U.S.A. § 6928(h), ("Bristol Consent Order" or "ACO"). See Exhibit B. Under the ACO, Rohm and Haas DVI agreed to, inter alia, perform a Facility Investigation ("FI"), an evaluation of the nature and extent of any release of hazardous wastes from the Site, and a Corrective Measures Study ("CMS"), which is designed to develop and evaluate alternative cleanup remedies at the Site. Rohm and Haas DVI agreed to perform these tasks on all portions of the Site including those portions owned by Chemical Properties and BTA.

29. Rohm and Haas DVI completed and submitted to EPA for review an investigation report, entitled "Remedial Investigation," and the Corrective Measures Study ("CMS"). EPA is reviewing this CMS.

30. Rohm and Haas' landfilling of wastes on Chemical Properties' portion of the Site occurred prior to Chemical Properties' purchase.

31. As of June 18, 1991, EPA has incurred a total of $379,063.45 at the Site. Of these costs, EPA spent $252,352.89 for contractors including sampling support and field investigation. The balance of $126,710.56 represents EPA's payroll, indirect, and travel costs. Of these costs, $83,351.80 are indirect costs. EPA's payroll costs include the costs of negotiation of one consent order, costs of review of all work performed by Rohm and Haas DVI's contractors and EPA's contractors as well as enforcement including litigation costs.

32. As of March 31, 1991, the Department of Justice, including the Environment and Natural Resources Division and the United States attorney's Office for the Eastern district of Pennsylvania, has incurred $6,523.96 in connection with enforcement at this Site.

33. Since 1979, the United States has incurred costs at the Site in an amount of $385,587.41, as of June 18, 1991. The United States continues to incur costs at the Site.

34. EPA has calculated interest on its costs pursuant to section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4). As of June 18, 1991, this interest totalled $15,761.37. For costs incurred before the complaint was filed, EPA calculated interest from the date of the complaint; for costs incurred after the complaint was filed, EPA calculated interest from the date of the expenditure.

35. The United States is seeking recovery of its costs and interest as of June 18, 1991 in an amount of $401,348.78.

36. The United States filed the complaint in this action on November 23, 1990.

37. Rohm and Haas DVI wrote a letter on October 10, 1986, to EPA Region III which stated Rohm and Haas DVI's opinion that under published policy, the Site was inappropriate for handling under the CERCLA program. See Exhibit C.

38. EPA published a document entitled "The Nation's Hazardous Waste Management Program at a Crossroads—the RCRA Implementation Study" in July 1990. See Exhibit D.

39. EPA Headquarters in Washington, D.C., published a document entitled, 1988 Interim Final Model Section 3008(h) Administrative Order on Consent. See Exhibit E.

40. EPA Region IV and VI have negotiated RCRA section 3008(h) consent orders which provide for reimbursement of the EPA's costs. See Exhibit F.

41. In the course of ACO negotiations with Rohm and Haas DVI, EPA Region III prepared a series of proposed draft ACOs which EPA attorneys and program personnel reviewed. EPA Region III submitted some of these drafts to Rohm and Haas DVI for review and comment.

42. One of the draft ACOs prepared by EPA contained a provision which required Rohm and Haas DVI to reimburse EPA for "all response and oversight costs incurred by the U.S. Government with respect to ... [the ACO]." See Exhibit G.

43. From 1979 until February 4, 1987, EPA incurred $173,409.59 in costs at the Site.

44. From February 4, 1987 until February 6, 1989, EPA incurred $74,868.39 in costs at the Site.

45. From February 4, 1987 until June 18, 1991, EPA incurred $205,653.83 in costs at the Site.

46. From February 6, 1989 until June 18, 1991, EPA incurred $103,785.44 in costs at the Site.

47. None of the defendants, Rohm and Haas, Rohm and Haas DVI, Chemical Properties of BTA, agreed, in the ACO or elsewhere, to reimburse the United States for response costs it has incurred at the Site or the costs of overseeing Rohm and Haas DVI's performance of the RCRA FI or CMS pursuant to the ACO.

48. Chemical Properties has taken the following actions with respect to the portions of the Site which it acquired from Rohm and Haas:

a. In 1985 and thereafter, provided BCM with the access necessary to do an investigation on portions of the Site it owns (defined herein as the "CP Property");

b. Installed fencing in 1970 and thereafter and maintained fencing on the CP Property;

c. Paved parts of the CP property in 1970 and paved other parts at later dates;

d. In 1984, all operations on the CP Property ceased;

e. In 1986, Chemical Properties removed structures on the CP Property, graded the CP Property, plugged sewer lines on the CP Property and removed underground storage tanks on the CP Property.

49. Chemical Properties purchased the CP property pursuant to deeds between Rohm and Haas and Chemical Properties. After Chemical Properties purchased the CP Property, Rohm and Haas used trucks of Chemical Leaman Tank Lines dispatched from CP Property to haul chemicals from Rohm and Haas' portion of the Site to a third location. These trucks then returned to CP Property where they were, on some occasions, cleaned and maintained using a wastewater pretreatment plant located on the CP Property. Aside from any contractual relationship which may be found in the facts set forth in the Joint Stipulation of Facts, for the purposes of this lawsuit, EPA and Chemical Properties know of no contract between Rohm and Haas and Chemical Properties which permitted Rohm and Haas to dispose, release or threaten release of a hazardous substance on the Site.

## II.

The following facts are found based on evidence received at trial:

50. The ACO of February 6, 1989 was negotiated by Ellen Friedell, an attorney employed by Rohm & Haas Company and Lawrence Falkin, an attorney employed by EPA.

51. Ellen Friedell graduated law school in 1973 and has been employed by Rohm & Haas since 1978. Her work involved waste issues and, in particular, the Bristol landfill. Lawrence Falkin graduated law school in 1986 and had been employed by EPA for about two months when the negotiations were begun in 1987.

52. When, in 1985, EPA proposed to put the landfill on the Superfund List—the popular name for the National Priorities List, consisting of sites supervised by EPA under CERCLA—Rohm & Haas submitted a letter in opposition. *See* finding 19 *supra.*

53. Ellen Friedell believed the purpose of the Superfund List was to deal with abandoned sites, and Rohm & Haas, in 1986, had refused to enter into a Superfund consent order proposed by EPA. *See* finding 19 *supra.*

54. The proposed Superfund consent order provided reimbursement for the government's oversight costs, including its investigation, supervision, internal salaries, and contractor's costs.

55. Thereafter, in February, 1987, EPA notified Rohm & Haas that it would agree to have the landfill disposal program conducted under RCRA. *See* finding 24 *su-*

*pra.* In the series of negotiations then begun between Ellen Friedell and Lawrence Falkin, technical staff also participated.

56. In these negotiations, reimbursement of EPA oversight costs was not discussed. Ellen Friedell believed that the landfill would be treated as a RCRA site and not placed on the Superfund List.

57. At all times, Rohm & Haas was ready, willing and able to correct the waste conditions at the landfill.

58. Ellen Friedell believed the government's reservation of rights provision in the ACO would enable the government to put the landfill on the Superfund List only if Rohm & Haas refused or was unable to take the required corrective action itself. The ACO does not contain such a limitation.

59. The landfill has not been placed on the Superfund List. *See* findings 24 and 25 *supra* as to the removal of the site from the proposed list.

60. As of the time the ACO was entered into, February 6, 1989, Ellen Friedell knew that the government had incurred about $250,000 in oversight costs.

61. The ACO does not contain a waiver by the government of a right to recover oversight costs. Ellen Friedell believed such a waiver resulted from the government's entering into the ACO, which did not mention such costs. Before the ACO was entered into, the government did not bill Rohm & Haas for oversight costs.

62. Lawrence Falkin, as an assistant regional counsel of EPA, had no authority to compromise CERCLA claims or agree not to sue. EPA's delegation manual did not so authorize assistant regional counsel. He headed the EPA negotiations team in regard to the Rohm & Haas landfill. He advised Ellen Friedell at the outset that he could not bind EPA.

63. Later, Lawrence Falkin advised Ellen Friedell that as a matter of EPA policy no assurance could be given that EPA would not sue in the future and that it would reserve all of its rights as part of the ACO.

64. The wording of the government's reservation of rights provision in the ACO was the result of extensive negotiation between Ellen Friedell and Lawrence Falkin. Eventually, they agreed to the language in the ACO on the basis that it reserved whatever rights the government had, leaving for future determination the specific nature of those rights. For the same reason, a provision was agreed to reserving Rohm & Haas' right to assert its legal position in the event of future disputes, excepting as expressly waived in the ACO.

### III.

The government's claim for oversight costs proceeds under the broad strict liability authorization of § 107 of CERCLA, 42 U.S.C. § 9607(a). Defendants do not contest any of the essential elements of CERCLA liability,[3] but insist that on several bases CERCLA is not applicable in this case. These defense arguments can be categorized as follows: First, that RCRA remedies are exclusive in this case—once having agreed to manage the Rohm & Haas landfill under RCRA, the government can not seek costs under CERCLA. RCRA does not enable recovery of oversight costs. Second, EPA is barred from recovery by the administrative consent order of February 6, 1989 under a res judicata or claim preclusion doctrine. Third, defendant Chemical Properties, Inc. has a complete defense under § 107(b)(3) of CERCLA, which exculpates innocent successors to ownership. Fourth, inclusion of enforcement and indirect costs is inappropriate because they are not response costs under the statute. Fifth, recovery of costs incurred more than three years before this

---

**3.** CERCLA liability under § 107: (1) ownership or operation of the Site; (2) the release of hazardous substances; (3) the Site is a facility; (4) the government incurred cleanup response costs. *United States v. Northeastern Pharmaceu-* *tical,* 810 F.2d 726, 742–744 (8th Cir.1986). Response costs are not recoverable if inconsistent with the National Contingency Plan or where a statutory third-party defense can be maintained under § 107(b)(3).

action was filed is barred by the statute of limitations.

### A.

■ While there may be cosmetic appeal to the RCRA preemption or exclusivity argument, particularly as projected against the history of this case, it has little support in the statutes or decisionally. The overwhelming evidence is that Congress intended CERCLA to be cumulative and not merely an alternative to RCRA or to be limited in its application to formally designated Superfund sites. *See Chemical Waste Mgt. v. Armstrong World Industries*, 669 F.Supp. 1285, 1290 (E.D.Pa.1987); *Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049, 1054 (D.C.Ariz.1984). There is no statutory expression that would prevent EPA from recovering costs incurred in supervising a so-called RCRA managed site. Instead, there are strong economic and environmental reasons for authorizing the recovery of such costs. Without a clear statutory statement to the contrary, this CERCLA remedy must be upheld as an available tool of environmental protection. The defense of an implied exclusion of CERCLA remedies must, therefore, be rejected.

### B.

■ Claim preclusion, based on the parties' consent order, is also a flawed defense. Principles of res judicata have been applied to the decision of an administrative agency, but only when it "is acting in a judicial capacity and resolves disputed issues of fact ... which the parties have had an adequate opportunity to litigate." *Astoria Federal Savings and Loan v. Solomino*, 501 U.S. ——, ——, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96, 104 (1991). Here, the ACO was a product of negotiation, not fact finding, and EPA was acting in its enforcement capacity, not as a judicial agency. But assuming that EPA's role were that of administrative fact-finder, the provisions of

the ACO expressly repudiate defendants' assertion of claim preclusion.

> This consent order shall not be construed as a covenant not to sue, release, waiver or limitation of any rights, remedies, powers and/or authorities, civil or criminal, which EPA has under RCRA, CERCLA, or any other statutory, regulatory or common law authority of the United States.

ACO—Section XIX Reservation of Rights at ¶ 2. It is hard to conceive of a more sweeping reservation of rights and remedies, or a clearer statement that resort to CERCLA may be anticipated. A consent decree will not be accorded preclusive effect when, as in this instance, there is an unmistakable reservation of pertinent rights. *United States v. Anthlone*, 746 F.2d 977, 983 n. 5 (3d Cir.1984); *Beehler v. Jeffes*, 664 F.Supp. 931, 935 (M.D.Pa.1986).

### C.

■ As to the specific types of CERCLA response costs claimed, defendants' objections appear to be without merit. Defendants acknowledge that their restrictive reading of the act has not gained decisional acceptance. Department of Justice enforcement costs—in this case, $6,523.96— are recoverable. *E.g., United States v. Shaner*, 1990 WL 115085, *3 (E.D.Pa. June 25, 1990); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 186 (W.D.Mo.1985) (government can recover all response costs including "... recovery of the costs ... to enforce the provisions of CERCLA, including the costs incurred for the staffs of the EPA and the Department of Justice"); *United States v. Northwestern Pharm. & Chem. Co.*, 579 F.Supp. 823, 851 (W.D.Mo.1984) ("CERCLA specifically allows for the recovery of attorneys' fees"); *United States v. South Carolina Recycling and Disposal, Inc.*, 653 F.Supp. 984, 1009 (D.S.C.1984).

■ Indirect response costs have also been found to be consistent with the National Contingency Plan and, therefore, collectible under CERCLA.[4] *United States v.*

---

**4.** "[I]ndirect costs are essentially 'overhead costs' attributable to 'rent and utilities for site and non-site office space; payroll and benefits for program managers, clerical support and other administrative support staff; and pay earned by on-scene coordinators while on leave, or

*R.W. Meyer, Inc.,* 889 F.2d 1497, 1503–04 (6th Cir.1989); *Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1250 (M.D.Pa.1990) (expenses incurred for air, water, and soil testing and monitoring, expert and investigative fees held recoverable if consistent with the National Contingency Plan); *United States v. Hardage,* 750 F.Supp. 1460, 1498–99 (W.D.Okl.1990).

Under defendants' scheme, EPA would not be entitled to oversight costs in any case in which it allowed an owner to perform a RCRA cleanup under its supervision. The unrealistic construct inherent in that proposition is self-evident.

### D.

█ Section 107(a) of CERCLA provides, in part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of . . . a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility

. . .

from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(1) all costs of removal or remedial actions incurred by the United States Government . . . not inconsistent with the national contingency plan. . . .

42 U.S.C. § 9607(a).

As an owner of the landfill facility, defendant Chemical Properties, Inc. is a responsible party. *See United States v. Tyson,* 25 E.R.C. (BNA) 1897, 17 E.L.R. 20527, 1986 WL 9250 (1986) (present owners liable under section 107 of CERCLA although no hazardous substances were disposed of after purchase of property).

Chemical Properties claims to be entitled to "the benefit of [the third party defense] set out in [§ 107(b)(3) ]," [5] which provides:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions. . . .

42 U.S.C. § 9607(b)(3). As stipulated, Chemical Properties, in 1968 and 1971, acquired a 10.94 acre portion of the site from Rohm & Haas by conveyance. *See* finding 6 *supra.* Under CERCLA, the transfer of title to land by deed comes within the definition of "contractual relationship."

The term 'contractual relationship', for the purpose of § 9607(b)(3) of this title includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in or at the facility, and one or more of the circumstances described in clause (i), (ii) or (iii) is also established by the defendant by a preponderance of the evidence:
(i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazard-

---

performing tasks not directly associated with a particular site.'" *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1502 (6th Cir.1989).

**5.** Trial brief of defendants at 36.

ous substance which is the subject of the release was disposed of on, in, or at the facility.

42 U.S.C. § 9601(35)(A). *See CPC Inter. Inc. v. Aerojet–General Corp.,* 777 F.Supp. 549, 581 (W.D.Mich.1991).

This defense, as CERCLA makes clear, involves two parts. § 107(b)(3). Defendant must prove, first, that the contamination was caused solely by a third party, and, second, that it was a third party with which defendant did not knowingly have a disposal-related contractual relationship. Here, as to the first prong, Chemical Properties concedes that its trucks were used to haul chemicals. Thereafter, the trucks were cleaned and maintained at a wastewater pretreatment plant located on Chemical Properties' portion of the site. *See* finding 49 *supra.* These facts themselves would negate the defense.

As to the second prong, the existence of the contractual relationship will not itself preclude the defense unless it is "in connection with" disposal-related activity. § 107(b)(3). *See Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.,* 964 F.2d 85, 87 (2d Cir.1992). If such a contractual relationship is made out, defendant must show that it "did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed on, in, or at the facility." 42 U.S.C. § 9601(35)(A).

[T]he defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertained information about the property, the obviousness of the presence or likely presence of contamination at the property, and the

ability to detect such contamination by appropriate inspection.

42 U.S.C. § 9601(35)(B).

Chemical Properties did not sustain this burden of due inquiry. It offered no evidence of having investigated the prior uses or previous ownership of the property. Additionally, as a hauler of hazardous substances, it must have been aware when it acquired the property that Rohm & Haas had maintained the site as a chemical landfill over many years.

For each of these reasons, Chemical Properties cannot rely on the third-party defense. It is doubtful whether the contamination was caused solely by Rohm & Haas, and there was a relevant contractual relationship. Chemical Properties does not qualify as an innocent third party in terms delineated by CERCLA. *Westwood Pharmaceuticals v. Nat. Fuel Gas Dist.,* 767 F.Supp. 456 (W.D.N.Y.1991); *International Clinical Laboratories v. Stevens,* 710 F.Supp. 466 (E.D.N.Y.1989); *see e.g., United States v. Serafini,* 706 F.Supp. 346 (M.D.Pa.1988); *United States v. Hooker Chemicals & Plastics Corp.,* 680 F.Supp. 546 (W.D.N.Y.1988).

### E.

■ Defendants also assert that claims for costs arising before November 1987 are barred by CERCLA's three-year statute of limitations. 42 U.S.C. § 9613(g)(2). The limitations period begins to run as of the time when all contamination has been removed. However, "removal" is not confined to on-site removal. *United States v. Allen,* 1990 WL 339488, \*6 (W.D.Ark. November 9, 1990) ("Clearly, the term removal is not limited to on-site activity and includes the time needed to dispose of the removed material as well as time needed to evaluate the need for further activity.").

Here, the complaint was filed on November 25, 1990, and the physical removal of contaminated soil by Rohm & Haas was completed in July 1987. Nevertheless, EPA did not propose to eliminate the site from the Superfund List until June 24, 1988. It was stipulated that EPA "continues to monitor, assess and evaluate the

release and threat of release of hazardous substances and Rohm & Haas DVI's activities at the site." *See* finding 27 *supra.* Even after this lawsuit was begun, it could not be said that complete "removal" under CERCLA had occurred. Given these facts, the statute of limitations defense is unavailing.

### IV.

The following conclusions of law are entered:

1. Plaintiff United States of America is entitled to recover from defendants $401,-348.78 for response costs under CERCLA and any other appropriate and proper response costs shown to be due after the filing of this action and in the future.

2. Plaintiff's claim is not precluded, barred, or diminished by—

a. EPA's management of the site under RCRA or the nonplacement of the site on the Superfund List;

b. The Administrative Consent Order of February 6, 1989;

c. Inclusion of enforcement costs and indirect costs;

d. As to Chemical Properties, Inc., the third-party defense under § 107(b)(3); or

e. The three-year statute of limitations.