UNITED STATES of America, Plaintiff,

v.

William M. DAVIS, et al., Defendants.

Civ. A. No. 90–0484 P.

United States District Court,
D. Rhode Island.

April 6, 1995.

---

Lois Schiffer, Asst. Atty. Gen., Robert E. Maher, Cynthia Huber, Robert H. Oakley, Environmental Enforcement Section, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, Kathleen Woodward, Asst. Regional Counsel, U.S.E.P.A., Region I, Boston, MA, for plaintiff.

R. Bradford Fawley, Down, Rachlin & Martin, Brattleboro, VT, Samuel D. Rosen, Paul Hastings Janofsky & Walker, New York City, Tom Angelone, Hodosh, Spinella & Angelone, Providence, RI, Robert Sanoff, Seth Jaffe, Foley Hoag & Eliot, Boston, MA, Roxanne Jayne, Cohen, Shapiro, Polisher, Sheikman and Cohen, Lawrenceville, NJ, Russell V. Randle, Patton, Boggs & Blow, Washington, DC, Alan C. Zetterberg, Sr. Corporate Counsel, Legal Div., Pfizer, Inc., New York City, Richard M. Squire, Cohen, Shapiro, Polisher, Sheikman and Cohen, Philadelphia, PA, Mark O. Denehy, Adler Pollock & Sheehan, Deming Sherman, Edwards & Angell, Providence, RI, S. Paul Ryan, East Providence, RI, Benjamin White, Vetter & White, Steven Raffa, Blish & Cavanagh, Providence, RI, William & Eleanor Davis, Greenville, RI, Barry P. Allen, Environmental Counsel, Briston–Myers Squibb Co., New York City, LB Kregenow, Pepper, Hamilton & Scheetz, Philadelphia, PA, for defendants.

*MEMORANDUM AND ORDER*

PETTINE, Senior District Judge.

In this case, the United States has filed suit under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") to recover costs incurred and to be incurred in responding to the release and threatened release of hazardous substances at the Davis Liquid Waste Site in Smithfield, Rhode Island. For the convenience of the Court and the parties the case has been trifurcated; at this initial stage, the only issues before the Court are those of liability. All issues pertaining to past and future costs incurred by the United States, as well as all issues pertaining to contribution among defendants and third-party defendants, are reserved for the later stages of the case.

*BACKGROUND:*

This is a case in which many issues of fact are hotly disputed by the parties, and one in which the outcome of these disputes will ultimately determine the outcome of the case. Nevertheless, the parties either agree on the following facts or the Court has adopted them as true, in the light of the evidence presented. First, although the exact dates during which the liquid waste disposal site was in operation are in dispute, the parties appear to agree that it was running at least from the fall of 1976 to some time in 1977. (Tr. at 132: 14–17, 11/12/93; UTC's Proposed Findings of Fact at 1.) The wastes found at the Site include various solvents, such as perchloroethylene, that were used as solvents in the metal finishing process, a process engaged in by UTC. Pratt & Whitney Aircraft ("Pratt & Whitney") was a division of defendant United Technologies Corporation ("UTC") in the 1970's and operated facilities for the manufacture of jet engines in East Hartford, Connecticut. UTC produced a hazardous waxy waste stream which was dark brown with a solvent smell and which contained solvents such as perchloroethylene. They disposed of their hazardous waste in drums, some of which were dark in color and others of which were light. The parties disagree as to what markings appeared on these drums. UTC also produced a non-hazardous waxy waste that was light in color.

In 1985, the United States' Environmental Protection Agency ("EPA") commenced a removal action at the Site, during which they sampled and investigated several hundred drums at the Site, categorized them, and disposed of them off-site. The United States filed suit pursuant to Section 107 of CERCLA against the following parties: William Davis as an owner and/or operator of the facility; Eleanor Davis as an owner of the facility; United Sanitation, Inc. and A. Capuano Brothers Inc. as "transporters" and "arrangers;" and Ciba–Geigy Corporation, Clairol Inc., Pfizer Inc., The Providence Journal Company, and United Technologies Corporation as "generators." At the start of trial, only UTC remained as a defendant in the case.

The fundamental dispute between the United States and UTC is factual. The United States claims to have found UTC's hazardous waste at the Davis Site and to have established the chain by which it arrived at the Site, whereas UTC claims that their hazardous waste was never deposited at the Site and that the United States' "proof" is simply a tissue of equivocal items that fails to prove liability by a preponderance of the evidence. The Court must turn its attention to these diametrically opposed stories in order to weigh the evidence and establish the facts.

*DISCUSSION:*

Liability under CERCLA is defined at Section 107. Under this section, the following four classes of individuals are subject to liability for the costs associated with the cleanup of hazardous waste from waste sites:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another

party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance....

42 U.S.C. §§ 9607(a)(1–4) (1994). Clearly, if UTC meets any of these definitions, it is the third one, that of a "generator."[1] In order to find generator liability under Section 107(a)(3) of CERCLA, courts have uniformly required proof of four basic elements: (1) the generator must have disposed of hazardous substances;[2] (2) the disposal must have been at a facility[3] which contains at the time of discovery hazardous substances of the kind disposed of by the generator; (3) there must be a release[4] or threatened release of that or any hazardous substance; and (4) the release or threatened release must trigger the incurrence of response[5] costs.

In the instant case, the parties agree that the Davis Site was a facility within the meaning of CERCLA (Common Stip. 3, Tr. at 97: 1–3, 11/18/93), that there was a release of hazardous substances at the Site (Colloquy, Tr. at 76: 5–16, 11/10/93), and that the United States has incurred response costs for response activities performed at the Site (Common Stips. 5–6, Tr. at 97: 6–12,

1. This Court has had previous opportunity to reflect upon the ambiguity of the language in CERCLA covering generator liability:

The ambiguity of this provision is apparent upon close inspection. As one court has noted, the literal terms of the statute could be interpreted to impose liability on a waste generator who arranges for waste disposal by contract or agreement, but who never actually delivers the waste to a disposal facility. CERCLA is a hastily-drawn statute quickly passed through a lame-duck Congressional session. Nonetheless, Congress intended broad judicial interpretation of CERCLA in order to give full effect to two important legislative purposes: to give the federal government the tools necessary for a prompt and effective response to hazardous waste problems and to force those responsible for creating hazardous waste problems to bear the cost of their actions.

*Violet v. Picillo*, 648 F.Supp. 1283, 1288 (D.R.I. 1986) (citations omitted).

2. Section 101(14) defines the term "hazardous substance" as follows:

(A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof

which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and synthetic gas.)

42 U.S.C. § 9601(14) (1994).

3. The statute defines a "facility" as follows:

(A) any building, structure, installation, equipment, pipe, or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9) (1994).

4. The statute defines "release" as

any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)....

42 U.S.C. § 9601(22) (1994).

5. Under the statute, "response" includes both removal and remedial activities; "[t]he terms 'respond' or 'response' means remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25) (1994). For a more detailed discussion of the distinction between removal and remedial actions, see infra note 12 and accompanying text.

11/18/93). The only elements of the prima facie case of generator liability that still remain at issue, therefore, are whether UTC arranged for the disposal of any substances at all that were ultimately deposited at the Davis Site, and if so, whether any of UTC's waste that was deposited at the Site was hazardous within the meaning of CERCLA. It is to these matters that the Court now turns.

*Was UTC Waste Deposited at the Davis Site?*

■ The first key issue at trial was whether UTC arranged for the disposal of any wastes that wound up at the Davis Site. It is established law that UTC is liable under CERCLA if its waste can be located and identified at the Davis Site, regardless of whether UTC intended its waste to end up there. This legal standard has already been articulated in this case:

> A generator need not have chosen a particular disposal site to be liable under section 107(a)(3). *Violet v. Picillo, supra,* 648 F.Supp. at 1290–91; *United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 176, 233–234 (W.D.Mo.1985). It is no defense to liability to claim that a transporter, with whom a generator arranged for the disposal of waste at a particular site, disposes of the waste somewhere else (unbeknownst to the generator). *O'Neil v. Picillo, supra,* 883 F.2d [176] at 182, n. 9 [ (1st Cir.1989) ]; *Violet v. Picillo, supra,* 648 F.Supp. at 1294; *United States v. Conservation Chem. Co., supra,* 619 F.Supp. at 176.

*United States v. Davis,* Report and Recommendation of Magistrate–Judge Boudewyns at 9 (D.R.I. August 5, 1991).

The government has assembled a variety of evidentiary items in support of its position that UTC's waste was in fact present at the Site. First, the government offers the testimony of William Davis, the owner and operator of the Davis Site. Davis testified that during the 1970's the waste haulers Macera

Brothers brought a few hundred drums to the Site, and that he saw Pratt & Whitney labels on some of the drums brought to the Site by Macera Brothers. He testified that the main wastes brought to the Site by Macera Brothers were waxy-type substances, and that some of the waste was a wax and solvent mix that could be poured. According to Davis, the color of the wax solvent mix contained in the drums with Pratt & Whitney labels was brown, and some of these Pratt & Whitney drums were dark in color. In general, the drums in which the wastes were contained appeared to be recycled drums, most of which were dark in color and some of which were light in color. Davis testified that the liquid that was in the wax-containing drums "smelled like it was carbon-tet," which he believed was a solvent. (Tr. at 149–151: 11/12/93.) Davis made a rough estimate that there were "maybe a few hundred" drums brought to the Site with Pratt & Whitney labels on them. (*Id.* at 153:1.)

■ In 1985, because of his belief that there were some drums on his property that belonged to Pratt & Whitney, Davis testified that he telephoned John Casey, attorney for Pratt & Whitney. Davis asked Casey to remove the drums, and soon thereafter, according to Davis' testimony, two people who said they were from Pratt & Whitney appeared at the Site to inspect the drums. Davis further testified that one of these two representatives of Pratt & Whitney said, upon examining the contents of the drums, either "that's my stuff" or "that's our stuff." (Tr. at 17: 19–20, 11/15/93).[6]

Davis' testimony supports the government's contention that UTC's waste was present at the Davis Site. Most obviously, Davis testified to seeing Pratt & Whitney labels on the drums of waxy waste that Macera Brothers brought to the Site. If this is true, and in the absence of persuasive evidence that despite the Pratt & Whitney la-

6. Both at trial and in their post-trial brief, UTC objected to the admission into evidence of the statement "that's my stuff" or "that's our stuff." UTC argues that because Davis was unable to identify whether it was Nelson or Averill who made the admission, and because Averill was an outside independent contractor for Pratt & Whit-

ney, therefore the introduction of the statement through Davis is inadmissible hearsay because Averill, an independent contractor, is not a party opponent. I reject this argument now, as I did at trial, because Averill was UTC's agent for the purpose of determining whether the drums originated at Pratt & Whitney.

bels the drums did not belong to UTC, it strongly supports the government's position. Davis also testified that the waxy waste contained in the drums labeled Pratt & Whitney was brown in color and that the drums were dark. In general, Davis' description of the waste brought to the Site by Macera Brothers is closely similar to uncontradicted evidence about the appearance and nature of Pratt & Whitney's hazardous waxy waste, i.e. their combination of masking wax and solvent. The government's position is further substantiated by Davis' testimony that an agent of Pratt & Whitney, upon viewing drums and waste at the Site, admitted that they belonged to Pratt & Whitney.

UTC attempted to persuade the Court that Davis fabricated both his claim that he saw drums at the Site that were labeled "Pratt & Whitney" and his claim that an agent of Pratt & Whitney conceded that the drums originated at that company. In their effort to do so, UTC pointed both to inconsistencies between Davis' trial testimony and his prior deposition testimony and inconsistencies between Davis' testimony and other evidence presented in the case.[7] Having reviewed the evidence, it is the opinion of this Court that these inconsistencies are not sufficient to sustain a finding that Davis lied, made up his evidence, or perjured himself. Therefore, I reject UTC's contention that none of Davis' testimony should be given any weight.

The second vital piece of evidence relied upon by the government in building its case is the testimony of Paul Palughi. Palughi was an employee of O.H. Materials, a contractor retained by EPA to assist in the 1985 removal of drums from the Site, and was present at the Site during the removal. At trial, Palughi testified that during the cleanup, he noticed a rotted out drum with "Pratt & Whitney Aircraft" labelled on it. He took particular notice of this because only a few days previously he had concluded a three month period of work at the UTC Pratt & Whitney Aircraft jet engine manufacturing plant in East Hartford.[8]

UTC urges the Court to disregard this evidence, claiming that an empty drum cannot establish liability.

[T]he empty scrap is insufficient to establish Pratt & Whitney's liability because there is no proof that the drum scrap came from Pratt & Whitney, there is no proof

---

7. These inconsistencies include the following:

— despite Davis' testimony that a Pratt & Whitney representative said "that's my stuff" or "that's our stuff" when inspecting the waste at the Site, neither Nelson or Averill recall making such a statement or hearing the other make such a statement (although they did testify that the waste in the drums looked "the same" as or "very similar" to the waste they had observed at Pratt & Whitney);

— despite Davis' testimony that he pointed out drums with Pratt & Whitney labels to the Pratt & Whitney representatives, neither Nelson nor Averill recall seeing such markings; and

— in his August 13, 1991 deposition, when asked if the Pratt & Whitney people had made any statements regarding what was in the barrels, Davis answered that they had not.

8. The following interchange took place between Mr. Palughi and the Court:

THE COURT: Okay. Tell me, as you sit here now, and as you recall the evidence, can you tell me whether or not any of these drums had any identifying marks on them or any identifying names on them?

THE WITNESS: Yes, sir. There was one drum—it's not—it wasn't still a drum any more. It had rotted.

THE COURT: It had what?

THE WITNESS: It had rotted away. When we were doing the original cleanup of the area to build the pad, I believe it was Chris found it, Chris Friis found it, and pointed it out to me. It had a small label about this big, a shipping label that said Pratt–Whitney Aircraft on it.

THE COURT: Is that the only one?

THE WITNESS: That's the only one that—

THE COURT: Had an identifying label on it?

THE WITNESS: —that I have knowledge of. There could have been a lot more. I wasn't looking for labels, sir. I was just sampling.

THE COURT: You personally saw.

THE WITNESS: I did see this, sir.

THE COURT: And what did it say?

THE WITNESS: It was a white label with black letters; it said Pratt–Whitney Aircraft on it. It had other writing. It was pointed out to me by Chris because we had just come from Pratt–Whitney and he made a joke about it. That's the only reason I remember it.

THE COURT: Did you see the contents of that drum.

THE WITNESS: It had no contents as I recall it, sir. It was a drum that had been rotted away and we were moving it like scrap metal to clean up the area so we could build the pad.

Tr. 181–183: 11/15/93.

that the drum scrap ever contained any waste, there is no proof that any waste that may have been in the drum at some time was released at the Davis Site, and there is no proof that any waste which may have been in the drum was a hazardous substance.

UTC's Post Trial Brief at 26. In response, the government cites to a prior case in front of this Court for the notion that an empty drum at a hazardous waste site can be assumed to have discharged its contents. *O'Neil v. Picillo,* 682 F.Supp. 706, 725 (D.R.I. 1988). In the instant case, the drum identified by Palughi as having a Pratt & Whitney label is not sufficient in and of itself to establish that UTC's waste was at the Site; however, in connection with other evidence, the Palughi testimony does serve as a corroboration of the government's version of the facts.

The next set of evidence upon which the government relies is the evidence surrounding the so-called "PMC drums." Pratt & Whitney had an internal numbering system it used to identify the chemicals and other raw materials it used (the Process Material Code or PMC system). Each chemical was assigned a unique PMC number, such as PMC 9015, which referred to perchloroethylene and PMC 9063, which referred to mineral spirits. Pratt & Whitney required its suppliers, such as Astro Chemicals (a supplier of perchloroethylene to Pratt & Whitney), to place the PMC numbers on the drums of chemicals delivered to Pratt & Whitney. Although Pratt & Whitney was not the only plating shop in New England to use PMC numbers (or to use perchloroethylene in their operations), long-time employees of Astro Chemicals testified that Pratt & Whitney was the only company for which Astro placed PMC numbers on drums.

A number of drums found at the Site were marked with PMC numbers. The extent to which these numbers substantiate UTC's ownership of the drums is bitterly contested. UTC argues that inconsistencies between their numbering system and the numbers that appeared on the drums prove that the drums could not have originated at Pratt & Whitney. The government maintains that the inconsistencies to which UTC points are minor and explainable, and that the strong correlations between Pratt & Whitney's PMC system and the numbers that appeared on the drums at the Davis Site show that the drums were in fact filled with Pratt & Whitney's waste.

UTC's most persuasive argument with regard to the PMC numbers is based upon the testimony of William Greene, a long-time Pratt & Whitney employee currently working in the manufacturing policies and process documentation group. Greene testified that he was in charge of issuing and maintaining PMC numbers and of the historic records of the PMC system. He further testified that when he worked as foreman in the plating department from 1967 to 1979, Pratt & Whitney had a specific PMC number, PMC 9551, which was on the drums in which hazardous wax waste from the plating department was placed. The word "wax" was also placed on some of those drums, but Greene never saw drums designated for hazardous wax waste disposal with "Pratt & Whitney" on them. UTC points to the fact that none of the drums found at the Site had "PMC 9551" or "wax" written on them to support its assertion that the waste at the Davis Site did not originate at Pratt & Whitney.

The government offers several points in rebuttal. First, the government points to the fact that hazardous masking wax waste was placed into barrels in more than one location at the Pratt & Whitney plant; some waste was placed in drums in the plating department, and some masking wax waste from the solvent recovery stills in the plating department was sent by means of a portable tank to the distilling unit of the maintenance department, where it was drummed. Greene worked in the plating department and is competent to serve as a witness as to waste disposal in that department. However, he did not work in the distilling unit of the maintenance department, and did not know what happened to that masking wax waste, or in what sort of barrels it was placed. Also, the testimony of Charles Nelson conflicted with that of Greene in that Nelson, whose work did take him to the maintenance department, testified that some of the drums

Pratt & Whitney used for waxy waste disposal were "reclaim barrels" that were in good shape and could be reused. These reclaim barrels were distinct both from new barrels purchased specifically for disposal purposes from a vendor and from barrels reconditioned by Pratt & Whitney. One can conclude from Nelson's testimony that the reclaim barrels used in the maintenance department may have been barrels that were originally sent to Pratt & Whitney from distributors such as Astro. When received by Pratt & Whitney from the distributors, these barrels would have borne PMC numbers corresponding to the original contents of the drums (such as "PMC 9015" for perchloroethylene). If Pratt & Whitney simply reused the drums without reconditioning them or changing their markings, then even after the barrels were filled with hazardous wax waste, they may still have borne old PMC numbers that corresponded to their original contents, not to their new wax and solvent waste contents. Greene, who worked in the plating department, would not have known about the custom in the maintenance department of using "reclaim barrels."

A number of drums at the Site had either PMC numbers on them or other markings arguably attributable to Pratt & Whitney. UTC focuses on three drums with PMC numbers; drum 12 had "PMC 9015," "astro," and "Perchloroethylene;" drum 10 had "PMC 9013," "Astro," and "Perchloroethylene;" and drum 9 had "PMC 6063," "Exxon," and "Varsol." [9] UTC's PMC number for perchloroethylene was 9015, and the government argues that drum 12, in and of itself, is evidence that Pratt & Whitney's waste was deposited at the Site. For further support, the government points to the PMC 9013 appearing on drum 10 and the PMC 6063 appearing on drum 9, each of which is one digit off from the proper PMC number for the element labeled on the drum. They claim that several years of exposure to the outdoor elements, as well as the fire that occurred at the Site, may either have caused the digit on the drum to appear distorted or caused an observer to misread it. In contrast, UTC relies upon the incorrect digits to sustain their position that drums 9 and 10 did not originate at Pratt & Whitney. With regard to drum 12, UTC argues that "PMC 9015" could have been Astro's date designation for the barrel, or that the drum, with its PMC marking, could have been old, in the stream of commerce for many years, and no longer attributable to Pratt & Whitney. In the light of the testimony discussed *supra* (Davis' identification of Pratt & Whitney drums at the Site, Astro's practice of placing PMC numbers only on Pratt & Whitney drums, Palughi's observation of a Pratt & Whitney label on a drum), this Court is persuaded by the government's arguments to accept the position that certainly drum 12, and very likely drums 9 and 10, originated at Pratt & Whitney. It is the finding of this Court, based on a preponderance of the evidence, that Pratt & Whitney waste was present at the Davis Site.[10] I now turn to the question of whether that waste was hazardous.

*Was the UTC Waste Deposited at the Davis Site Hazardous?*

■ Having established that UTC drums filled with UTC waste were present at the Davis Site, I am now faced with the question of the nature of that waste. In order for UTC to be liable under CERCLA, the UTC wastes disposed of at the Davis Site must include hazardous substances, and the hazardous substances present at the Davis Site

---

9. Varsol is a brand name for the solvent known as mineral spirits. Pratt & Whitney had a PMC number for mineral spirits, PMC 9063.

10. At trial, this Court admitted a line of evidence *de bene*. This evidence included testimony by Irving Blinkhorn, the manager of Acme Services in the mid 1970's. Blinkhorn testified as to information told to him by Donald Turner, who at the time served as Acme's manager of operations, and who had died by the time of trial. The government argued that this evidence was admissible in one of several ways: under Fed.R.Evid. 803(6) as an oral statement made in the regular course of business; under Fed.R.Evid. 804(b)(5) as a residual exception; or under Fed.R.Evid. 803(24) as a residual exception. UTC argues that this evidence is inadmissible under any of these provisions and that it should be disregarded by the Court. Because the government presented other evidence sufficient for me to decide this case, I need not come to a decision on whether or not to allow the *de bene* Blinkhorn testimony into evidence.

must be of the same type. Thus, this Court must establish the nature of UTC's hazardous waste and must make the determination that the same type of hazardous waste was present at the Site.

Pratt & Whitney's hazardous waste stream consisted of a combination of masking wax and solvent, such as perchloroethylene or 1,1,1-trichloroethane. It was dark brown in color, smelled strongly of solvent, and was viscous or partly solid and partly liquid in consistency. During the 1985 investigation of the Davis Site by Pratt & Whitney agents, Nelson and Averill both examined drums filled with a waxy waste. Nelson described the waste as "a very dark brown, almost black, very greasy looking waste with a strong solvent smell to it" (Tr. at 158: 11–16, 11/15/93), and as looking and smelling very similar to Pratt & Whitney's solvent-contaminated wax waste. (Tr. at 158: 21–23; 159: 10–12, 11/15/93). Averill confirmed the similarity between the waste at the Site and Pratt & Whitney's waste; "[t]he appearance would be the same as the wax bottom type of materials that would come out of Pratt–Whitney's [still bottom] recovery process." (Tr. at 126: 22–127: 3, 11/16/93). Furthermore, Averill's analysis of two samples of waste from the Site showed high levels of the solvent perchloroethylene, levels that were comparable to those appearing in Pratt & Whitney's solvent contaminated waste. Based on this evidence, it is my conclusion that, based on a preponderance of the evidence, the waste deposited by Pratt & Whitney at the Site was hazardous. Thus, I find that UTC is liable as a generator under Section 107(a)(3) of CERCLA.

*UTC's Statute of Limitations Defense:*

▮ UTC claims that the United States' claims against it are barred by the statute of limitations contained in Section 113(g)(2)(A) of CERCLA, 42 U.S.C. § 9613(g)(2)(A), which states that "an initial action for recovery of the costs [of removal actions] . . . must be commenced . . . within 3 years after completion of the removal action." UTC contends that the drum cleanup was completed in February of 1986, but the suit was not filed until September 27, 1990, and that because more than three years passed between the completion of cleanup and the commencement of the suit, the United States' case is time barred.

The government responds to this claim with the assertion that, under CERCLA, the statute of limitations does not begin to run until the EPA issues a Record of Decision ("ROD"). In this case, EPA issued the ROD on September 27, 1987, precisely three years prior to the government's filing of the complaint in this case. Under the government's theory, then, the statute of limitations contained in CERCLA does not bar their case.

At issue is whether the removal action at the Davis Site was limited to taking the drums off the Site, or whether it included the Remedial Investigation and Feasibility Study ("RI/FS") and the issuance of the ROD.[11] Both the statutory language and the relevant case law squarely support the government's position that a removal action includes the RI/FS and the issuance of the ROD.

CERCLA offers the following definition of removal:

> The terms "remove" or "removal" means [sic] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to *monitor, assess, and evaluate the release or threat of release of hazardous substances,* the disposal of removed material, or *the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment,* which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23) (1994) (emphasis added).[12] While preparing and issuing the

---

**11.** The RI/FS is a process in which EPA gathers information concerning whether additional cleanup measures need to be carried out at the Site, and if so, which measures would be appro- priate. The ROD sets forth subsequent remedial measures for the Site.

**12.** As discussed supra at note 5, "response" activities not only include "removal" activities, they

RI/FS and the ROD, EPA engages in activities that fall under CERCLA's definition of "removal;" EPA does "monitor, assess, and evaluate the release or threat of release of hazardous substances." Thus, to decide that a removal action is over when the physical removal is over but before the process of monitoring, assessing and evaluating the damage has come to completion violates the clear sense of the statutory language.

Cases that have grappled with this issue have overwhelmingly concluded that the removal process does not end until the completion of the RI/FS and the issuance of the ROD. The clearest articulation of this notion appears in *United States v. Jack Allen*, No. 90–2093, 1990 WL 339488, *6 (W.D.Ark. Nov. 6, 1990), in which the court made the following statement:

> Clearly, the term removal (as defined by CERCLA), is not limited to on-site activity and includes the time needed to dispose of the removed material as well as the time needed to evaluate the need for further activity. Defendants have not alleged that the EPA unnecessarily delayed in making the determination that no further on-site activity was needed. We therefore conclude that this suit was timely filed under 42 U.S.C. § 9613(g)(2)(A).

*See also United States v. Rohm and Haas Company*, 790 F.Supp. 1255, 1264 (E.D.Pa. 1992) ("The limitations period begins to run

also include "remedial" activities. Remedial action is defined by the statute as follows:

> The terms "remedy" or "remedial action" means [sic] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure

as of the time when all contamination has been removed. However, "removal" is not confined to on-site removal"); *United States v. Petersen Sand and Gravel, Inc.*, 824 F.Supp. 751, 755 (N.D.Ill.1991) ("the record of decision serves as the EPA's final action in the remedial investigation and feasibility study removal action process.... the statute of limitations begins running when the remedial investigation and feasibility study removal action are completed by the EPA's issuance of its record of decision"); *United States v. R.A. Corbett Transport, Inc.*, 785 F.Supp. 81, 82 (E.D.Tex.1990) ("all Site activities conducted by the United States, including the remedial investigation, were removal actions under the meaning of CERCLA").

UTC makes one more ingenious albeit ultimately unpersuasive argument as to why the government's case is time-barred. They argue that the cases that measure the statute of limitations to the date of the issuance of the ROD are inapplicable to the facts at hand because the removal costs in those precedents relate to clean-up from leaking drums whereas, under UTC's theory of this case, any drums from the Davis Site that may have been attributable to them were intact and non-leaking.[13] Thus, they argue,

> [i]f this Court were to hold that the statute of limitations for the discrete removal of non-leaking drums continues beyond three

that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24) (1994).

**13.** This theory of the case has not been accepted by the Court. Evidence such as Palughi's identification of an empty drum scrap with a Pratt & Whitney label supports this Court's belief that UTC's wastes were discharged into the environment at the Davis Site.

years after they are removed from the site just because EPA continues to incur response costs at the site as a result of other leaking drums or tanker waste disposals, the three year statutory limitation on recovery of removal costs provided by Congress will have been eviscerated and indefinitely extended until EPA completes all activities at a Site.

UTC's Post Trial Brief at 44. Although this argument is creative, UTC fails to indicate any statutory or judicial authority for its belief that Congress intended CERCLA's scheme of a statute of limitations that dates from a single removal action for a site not to apply in a case where wastes are contained in discrete, intact drums. The logic that underlies the teaching that all activities surrounding the cleanup and monitoring of a site comprise one "removal action" is not compromised because the waste is of a certain type or in a certain form. This Court rejects UTC's statute of limitations arguments, and holds that this case was timely filed under 42 U.S.C. § 9613(g)(2)(A).[14]

SO ORDERED.

---

14. Because of this holding, I need not reach the government's argument this action is timely un-

der the statute of limitations contained in Section of 113(g)(2)(B) of CERCLA.